## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

LINDA SPIVEY,               )
                                 )
      Plaintiff,          )
                                 )
v.                            )     **CASE NUMBER:**
                                 )     **2:07-CV-594-WHA**
FRED'S, INC.,               )
                                 )
      Defendant.     )

---

## DEFENDANT FRED'S STORES OF TENNESSEE, INC.'S MOTION FOR
## SUMMARY JUDGMENT

---

Comes Now the Defendant, Fred's Stores of Tennessee, Inc., (hereinafter referred to as "Fred's"), by and through its undersigned counsel of record, and respectfully request this Honorable Court to enter, pursuant to Rules 54(b) and 56 of the Federal Rules of Civil Procedure, a final summary judgment dismissing Plaintiff Linda Spivey's claims against Fred's on the grounds that there is no genuine issue as to any material fact and Fred's is entitled to judgment as a matter of law:

In support of this motion, Fred's relies upon the following:

1.     Complaint, attached as Exhibit A to Fred's Evidentiary Submission in Support of Memorandum in Support of Motion for Summary Judgment, filed contemporaneously herewith;

2.     Deposition of Linda Spivey, attached as Exhibit B to Fred's Evidentiary Submission in Support of Memorandum in Support of Motion for Summary Judgment, filed contemporaneously herewith;

3.      Notice of Removal, attached as Exhibit C to Fred's Evidentiary Submission in Support of Memorandum in Support of Motion for Summary Judgment, filed contemporaneously herewith;

4.      Answer, attached as Exhibit D to Fred's Evidentiary Submission in Support of Memorandum in Support of Motion for Summary Judgment, filed contemporaneously herewith;

5.      Amended Answer, attached as Exhibit E to Fred's Evidentiary Submission in Support of Memorandum in Support of Motion for Summary Judgment, filed contemporaneously herewith; and

6.      Fred's Memorandum in Support of Motion for Summary Judgment, filed contemporaneously herewith.

WHEREFORE, PREMISES CONSIDERED, Defendant Fred's Stores of Tennessee, Inc. respectfully requests this Honorable Court enter an Order granting final summary judgment in this case as no genuine issues of material fact exist and Fred's Stores of Tennessee, Inc. is entitled to judgment as a matter of law.

RESPECTFULLY SUBMITTED this the 2nd day of April, 2008.

/s/ Ashley E. Manning
Daniel S. Wolter (WOL012)
Ashley E. Manning (MAN048)
Attorneys for Defendant Fred's Stores of
Tennessee, Inc.

**OF COUNSEL:**

Gaines, Wolter & Kinney, P.C.
3500 Blue Lake Drive
Suite 425
Birmingham, AL 35243
(205) 980-5888 Phone
(205) 980-1098 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jackson B. Harrison, Esq.
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, Alabama 36117

/s/ Ashley E. Manning
OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **LINDA SPIVEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER:** |
| | ) | **2:07-CV-594-WHA** |
| **FRED'S, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### DEFENDANT FRED'S STORES OF TENNESSEE, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Comes Now Defendant, Fred's Stores of Tennessee, Inc. (hereinafter "Fred's"), and pursuant to Rules 54(b) and 56 of the *Federal Rules of Civil Procedure* states no genuine issues of material fact exist and Fred's is entitled to judgment as a matter of law. Accordingly, in support thereof, Fred's submits the following Memorandum and accompanying Exhibits:

### I.    STATEMENT OF FACTS

This case involves an incident which allegedly occurred on November 11, 2006 at Fred's Eastern Boulevard store location in Montgomery, Alabama. (See Complaint, p. 2, ¶ 7, attached as Exhibit A; see also Deposition of Linda Spivey, p. 21, lines 11, 21-23, attached as Exhibit B). The Plaintiff, Linda Spivey (hereinafter "Spivey) testified she had driven to Fred's for the purpose of shopping for Christmas baskets. (Exhibit B, p. 22, lines 15-16). Spivey testified she walked down the aisle to look at the Christmas baskets and returned to the front of the store to the apparel department, stopping to look at the

sweaters and blue jeans. (Exhibit B, p. 24, lines 5-23). Spivey was pushing a buggy. (Exhibit B, p. 24, lines 5-7). She testified the sweaters and blue jeans were located near a wall in the front of the store. (Exhibit B, p. 24, lines 17-19). She placed a sweater in her buggy, pushed her buggy forward, then stopped and looked over toward the blue jeans which were hanging on a rack close to the wall. (Exhibit B, p. 24, lines 20-23, p. 25, lines 1-3, p. 28, lines 16-23, p. 29, lines 11-13). At that point, Spivey testified she heard a loud noise, looked up and alleges that a picture frame fell down, hitting her on the face and shoulder. (Exhibit B, p. 25, lines 5-13). Spivey testified she did not know where the picture frame fell from, stating "[i]t had to come off of the wall." (Exhibit B, p. 31, lines 5-8). Spivey testified there was a shelf on the wall in the area and that there were picture frames on the shelf. (Exhibit B, p. 31, lines 9-14). However, Spivey maintains she was standing approximately six to eight feet from the wall where the shelf was located and that her buggy was directly between her and the wall. (Exhibit B p. 37, lines 15-20, p. 38, lines 6-8). Spivey testified that she did not notice there was a shelf holding picture frames in the area while she was looking at the clothing; however, she admits that had she looked up at the wall, she would have seen the shelf. (Exhibit B, p. 32, lines 6-17). According to Spivey, there were no other customers in the area when this incident occurred. (Exhibit B, p. 42, lines 4-6). Spivey also testified there were no employees in the area. (Exhibit B, p. 46, lines 8-11).

Spivey admits that no store employees said anything to her that day that gave her any reason to believe that they were aware that the frame may fall from the shelf or that the frame was not secure on the shelf. (Exhibit B, p. 48, lines 20-23, p. 49, lines 1-4). Spivey likewise testified that she has no evidence to support that Fred's had any

knowledge of any dangerous condition involving the picture frame. (Exhibit B, p. 49, lines 9-13, p. 82, lines 2-7). Although Spivey testified that she believes Fred's "should notice their stuff to make sure that picture frames is secure up there on that wall" she admitted that she has no evidence to indicate that Fred's was not making sure that items such as picture frames were secure on the walls or shelves. (Exhibit B, p. 82, lines 13-20).

Spivey admits that no Fred's employee gave her any indication that they were aware the picture frame could fall and had failed to secure it on the shelf. (Exhibit B, p. 82, lines 16-23, p. 83, lines 1-4). Spivey does not maintain that any specific employee of Fred's did anything wrong with respect to this incident. (Exhibit B, p. 84, lines 4-10).

On May 22, 2007, Spivey filed a Complaint in the Circuit Court of Montgomery County, Alabama naming Fred's as a defendant and setting forth claims for negligence and negligent infliction of emotional distress. (Exhibit A). On June 26, 2007, this case was removed to the United States District Court for the Middle District of Alabama, Northern Division. (See Notice of Removal, attached as Exhibit C). On July 3, 2007, Fred's filed an Answer to the Complaint, including numerous affirmative defenses. (See Answer, attached as Exhibit D). On September 14, 2007, Fred's filed an Amended Answer to the Complaint. (See Amended Answer, attached as Exhibit E).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *See also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986); Shalimar Contractors, Inc. v. American States Ins.Co., 975 F. Supp. 1450 (M.D.

Ala. 1997).    The court must construe the evidence and factual inferences in the light most favorable to the non-moving party. <u>Givahn v. Electronic Engineers, Inc.</u>, 4 F. Supp. 2d 1331, 1335 (M.D. Ala. 1998)(citing <u>Adickes. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). The party seeking summary judgment has the burden to establish there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment may establish this through the use of pleadings, depositions, interrogatories, admissions in the file and affidavits. <u>Celotex</u>, 477 U.S. at 323. In cases where the non-moving party will bear the burden of proof at trial, the moving party may either submit affirmative evidence negating an essential element of the non-moving party's claim, or demonstrate that the non-moving party's evidence is insufficient to establish an essential element of his claim. <u>Celotex</u>, 477 U.S. at 322.

When the moving party makes out a *prima facie* case that no genuine issue of material fact exists, the burden shifts to the non-moving party to rebut the showing by presenting substantial evidence of the existence of a genuine issue of material fact <u>Celotex</u>, 477 U.S. at 323.    Neither unsubstantiated assertions nor conclusory allegations are sufficient to satisfy the non-moving party's burden. <u>Earley v. Champion Int'l Corp.</u>, 907 F. 2d 1077, 1081 (11th Cir. 1990); <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590 (11th Cir. 1987).    Courts have defined "substantial evidence" as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." <u>West v. Founders Life Assurance Co. of Florida</u>, 547 So. 2d 870, 871 (Ala. 1989); *see also* <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1438 (11th Cir. 1991). The non-moving party must go

beyond the pleadings, and by affidavits or other evidence, he must show that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 323; *See also* FED. R. CIV. P. 56(e). In meeting this burden, the nonmoving party must do more than simply show that there is a metaphysical doubt as to the material facts. The non-moving party must demonstrate there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 323.

## III.    ARGUMENT

### A.    Spivey Is Unable To Provide Substantial Evidence That Fred's Created Or Had Notice Of The Condition Which She Claims Caused Her Injury.

In her Complaint, Spivey alleges that Fred's "owed [Spivey] a duty of care to not place [Spivey] in danger of damage or loss by securing and ensuring that the walkway inside the store…was free from falling objects" and that Fred's "breached that duty of care to [Spivey] by failing to secure the walkway inside the store…and allowing a large, heavy picture to fall from the rafters injuring [Spivey]." (Complaint, p. 2, ¶¶ 12, 13). However, Spivey is unable to produce substantial evidence that this incident was caused by an act or omission on the part of Fred's or that Fred's had notice of the condition she claims caused her injury. Therefore, summary judgment is due to be granted.

A landowner is "under a duty to use reasonable care and diligence to keep the premises in a safe condition, or, if the premises [are] in a dangerous condition, to give sufficient warning so that, by use of ordinary care, [an invitee can] avoid the danger." <u>Ex parte Industrial Distribution Services Warehouse, Inc.</u>, 709 So. 2d 16, 19 (Ala. 1997). The Alabama Supreme Court has held as follows:

> [T]here is a duty upon all storekeepers to exercise reasonable care in providing and maintaining a reasonably safe premises for the use of their customers. The storekeeper is not the insurer of the customers' safety but is liable for injury only in the event he negligently fails to use reasonable

care in maintaining his premises in a reasonably safe condition.  No presumption of negligence arises from the mere fact of injury to the customer.  The burden rests upon the plaintiff to show that the injury was proximately caused by the negligence of the storekeeper or one of its servants or employees.  Actual or constructive notice of the presence of the offending substance must be proven before the proprietor can be held responsible for the injury.

Vargo v. Warehouse Groceries Mgmt., Inc., 529 So. 2d 986 (Ala. 1988); see also Brown v. Autry Greer & Sons, Inc., 551 So. 2d 1049, 1050 (Ala. 1989) (stating "An invitor's duty to an invitee is to keep his premises in a reasonably safe condition.  The owner of the premises is not an insurer of the safety of its invitees, and the principle of res ipsa loquitur is not applicable.  Furthermore, there is no presumption of negligence from the mere fact of an injury to an invitee."); Cloninger v. Wal-Mart Stores, Inc., 794 So. 2d 364 (Ala. 2001) (Affirming judgment on jury verdict in favor of Wal-Mart Stores, Inc. stating the evidence supported a finding that the incident, involving a fan that fell from a store shelf hitting a customer, was not caused by any act or omission of Wal-Mart).

First, Spivey is unable to present any evidence that this incident was caused by an act or omission on the part of Fred's.  Spivey testified she did not know what caused the frame to fall.  (Exhibit B, p. 39, lines 2-6).  In fact, she stated she did not know where the picture frame fell from, stating "[i]t had to come off of the wall."  (Exhibit B, p. 31, lines 5-8).  She had not seen any Fred's employees in or around the aisle.  (Exhibit B, p. 46, lines 8-11).  Spivey can provide no evidence that any store employees were aware that the frame was not secured on the shelf or that any Fred's employees had knowledge of any dangerous condition involving the picture frame.  (Exhibit B, p. 48, lines 20-23, p. 49, lines 1-4 and 9-13, p. 82, lines 2-7).  She also testified that she does not allege that any specific employee of Fred's did anything wrong with respect to this incident.

6

(Exhibit B, p. 84, lines 4-10). Spivey is unable to provide substantial evidence that Fred's failed to keep its premises in a reasonably safe condition or that her injuries were caused by an act or omission on the part of Fred's or its employees. Accordingly, Spivey's negligence claim fails as a matter of law.

Second, Spivey is unable to present any evidence that Fred's had notice of the condition she claims caused her injury. Spivey admits that no store employees said anything to her that gave her reason to believe they were aware that the frame may fall from the shelf or that they were aware that the frame was not secure on the shelf. (Exhibit B, p. 48, lines 20-23, p. 49, lines 1-4). She likewise can present no evidence that Fred's had any knowledge of any dangerous condition involving the picture frame. (Exhibit B, p. 49, lines 9-13, p. 82, lines 2-7). As Spivey is unable to demonstrate any actual or constructive notice of an alleged dangerous condition on the part of Fred's, no genuine issues of material fact exist and Fred's is entitled to judgment as a matter of law.

**B.    Spivey's Negligent Infliction Of Emotional Distress Claim Fails As A Matter Of Law.**

The Alabama Supreme Court has held "there is no cause of action for the negligent infliction of emotional distress." Allen v. Walker, 569 So. 2d 350, 352 (Ala. 1990). However, in negligence actions, Alabama follows the "zone of danger" test, "which limits recovery of mental anguish damages 'to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct.'" Wal-Mart Stores, Inc. v. Bowers, 752 So. 2d 1201, 1203 (Ala. 1999) (quoting AALAR, Ltd., Inc. v. Francis, 716 So. 2d 1141, 1147 (Ala. 1998). In order for Spivey to recover for mental anguish damages under a

theory of "negligent infliction of emotional distress," she must provide substantial evidence of negligence on the part of Fred's. As discussed above, Spivey is unable to provide any evidence this incident involved any act or omission on the part of Fred's or that Fred's had any notice of any alleged defective condition on the premises; accordingly, no genuine issues of material fact exist and Fred's is entitled to judgment as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Fred's Stores of Tennessee, Inc. respectfully requests this Honorable Court grant Defendant's Motion for Summary Judgment as to all of Spivey's claims.

RESPECTFULLY SUBMITTED this the 2nd day of April, 2008.

/s/ Ashley E. Manning
Daniel S. Wolter (WOL012)
Ashley E. Manning (MAN048)
Attorneys for Defendant Fred's Stores of
Tennessee, Inc.

**OF COUNSEL:**

Gaines, Wolter & Kinney, P.C.
3500 Blue Lake Drive
Suite 425
Birmingham, AL 35243
(205) 980-5888 Phone
(205) 980-1098 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:


Jackson B. Harrison, Esq.
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, Alabama 36117


/s/ Ashley E. Manning
OF COUNSEL

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA SPIVEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER:** |
| | ) | **2:07-CV-594-WHA** |
| **FRED'S, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**DEFENDANT FRED'S STORES OF TENNESSEE, INC.'S EVIDENTIARY
SUBMISSION IN SUPPORT OF MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

---

Comes Now the Defendant Fred's Stores of Tennesse, Inc. (hereinafter referred to as "Fred's"), and submits the following evidence in support of its Motion for Summary Judgment:

1.     Exhibit A – Complaint.

2.     Exhibit B – Deposition of Linda Spivey.

3.     Exhibit C – Notice of Removal.

4.     Exhibit D – Answer.

5.     Exhibit E – Amended Answer.

WHEREFORE, PREMISES CONSIDERED, Defendant Fred's Stores of Tennessee, Inc. respectfully requests this Honorable Court enter summary judgment in favor of Fred's as no genuine issues of material fact exist and Fred's is entitled to judgment as a matter of law.

RESPECTFULLY SUBMITTED this the 2nd day of April, 2008.

/s/ Ashley E. Manning
Daniel S. Wolter (WOL012)
Ashley E. Manning (MAN048)
Attorneys for Defendant Fred's Stores of
Tennessee, Inc.

**OF COUNSEL:**

Gaines, Wolter & Kinney, P.C.
3500 Blue Lake Drive
Suite 425
Birmingham, AL 35243
(205) 980-5888 Phone
(205) 980-1098 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jackson B. Harrison, Esq.
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, Alabama 36117

/s/ Ashley E. Manning
OF COUNSEL

2

ELECTRONICALLY FILED
2007
CV-2007-
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
MELISSA RITTENOUR, CLERK

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| LINDA SPIVEY | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CASE NO. CV-2007_____ |
| | ) |
| FRED'S, INC. | )   JURY TRIAL DEMANDED |
| | ) |
| Defendant. | ) |

### COMPLAINT

### I. PARTIES

COMES NOW Plaintiff, LINDA SPIVEY, by and through counsel and respectfully pleads and alleges as follows:

1.    Plaintiff, LINDA SPIVEY, is an individual who is over the age of nineteen and resides in Crenshaw County, Alabama.

2.    Defendant, FRED'S, INC., is a corporation whose Articles of Incorporation are filed in the State of Tennessee and whose address is 4300 NEW GETWELL RD., Memphis, TN 38118.

### II. JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to Ala. Code § 12-11-30(1).

4.    This Court has venue over this action pursuant to Ala. Code § 6-3-7(a)(1).

**EXHIBIT**

A

### III. FACTUAL ALEGATIONS

7.    On or about November 11, 2006, Plaintiff was a customer in the Eastern Boulevard location of the Defendant.

8.    The Defendant negligently displayed a large, heavy picture along the walkway of its customers.

9.    While in the Defendant's store, the large picture fell from the wall and injured the Plaintiff.

10.    The Plaintiff has suffered bodily damage and pain and suffering as a direct result of the previously stated incident.

### IV. CAUSES OF ACTION

**COUNT ONE- NEGLIGENCE**

11.    Plaintiff realleges all allegations and averments contained in paragraphs (1) through (10) as if fully set out herein.

12.    The Defendant owed the Plaintiff a duty of care to not place the Plaintiff in danger of damage or loss by securing and ensuring that the walkway inside the store of the Defendant was free from falling objects.

13.    The Defendant breached that duty of care to the Plaintiff by failing to secure the walkway inside the store of the Defendant and allowing a large, heavy picture to fall from the rafters injuring the Plaintiff.

14. The Defendant's breach of its duty of care to the Plaintiff caused the Plaintiff to be damaged physically and emotionally.

WHEREFORE, the Plaintiff, LINDA SPIVEY, demands judgment against the Defendant, FRED'S, INC.., any and all compensatory damages she has suffered as a result of the Defendant's negligence. Additionally, the Plaintiff demands judgment for punitive damages against the Defendant, FRED'S, INC..

**COUNT TWO- NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

15. Plaintiff realleges all allegations and averments contained in paragraphs (1) through (10) as if fully set out herein.

16. The Defendant owed the Plaintiff a duty of care to negligently cause the Plaintiff emotional distress.

17. The Defendant breached that duty of care to the Plaintiff by failing to secure the walkway inside the store of the Defendant and allowing a large, heavy picture to fall from the rafters injuring the Plaintiff.

18. The Defendant's breach of its duty of care to the Plaintiff caused the Plaintiff to suffer severe emotional distress.

WHEREFORE, the Plaintiff, LINDA SPIVEY, demands judgment against the Defendant, FRED'S, INC.., any and all

compensatory damages she has suffered as a result of the Defendant's negligent infliction of emotional distress. Additionally, the Plaintiff demands judgment for punitive damages against the Defendant, FRED'S, INC..

**V.    PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff, LINDA SPIVEY, respectfully prays that this Court:

(a)    Assume jurisdiction over this action;

(b)    Empanel a jury to decide such triable issues as may exist in this case;

(c)    Grant to Plaintiff such relief to which it is entitled;

(d)    Make such award of costs, attorney's fees and expenses as may be permitted by law or equity.


Respectfully submitted this 22nd day of MAY, 2007.


/S/ JACKSON B. HARRISON
Jackson B. Harrison (HAR 285)
Attorney for Plaintiff


OF COUNSEL:
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, AL 36117
(334) 819-8920
(334) 819-8923 (fax)

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT FOR
     THE MIDDLE DISTRICT OF ALABAMA
2              NORTHERN DIVISION
3
4
     LINDA SPIVEY,          )
5                           )
     PLAINTIFF,       )
6                           )
                       ) CIVIL
7    vs.             ) ACTION
                       ) NO.
8                       ) 2:07-CV-594
     FRED'S, INC.,         ) -WHA
9                           )
     DEFENDANTS.       )
10                      )
11
12
13
         DEPOSITION OF LINDA SPIVEY
14                      ·
15
16
17   The deposition of LINDA SPIVEY was taken
18   before Anna Tolleson, CSR, as Commissioner,
19   on March 12, 2008, by the defendant,
20   commencing at 10:00 a.m., in the office of
21   the plaintiff, in Montgomery, Alabama,
22   pursuant to the stipulations set forth
23   herein.

**Page 2**

1             APPEARANCES
2
     FOR THE PLAINTIFF:
3    THE HARRISON FIRM, LLC
     8425 Crossland Loop
4    Montgomery Alabama 36117
     BY:  Brett Harrison, Attorney at Law
5    BY:  Eric Brown, Attorney at Law
6    FOR THE DEFENDANTS:
     Gaines, Wolter & Kinney, P.C.
7    3500 Blue Lake Drive, Suite 425
     Birmingham, Alabama 35243
8    BY:  Ashley E. Manning, Attorney at Law
9
10            --oOo--
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 3**

1              INDEX
2
3    Examination by Mrs. Manning.........5
4
5
6            EXHIBITS
7
8    Defendant's Exhibit No. 1..........84
9    Defendant's Exhibit No. 2..........84
10   Defendant's Exhibit No. 3..........98
11
12            --oOo--
13
14
15
16
17
18
19
20
21
22
23

**Page 4**

1            STIPULATIONS
2        It is hereby stipulated by and between
3    counsel that the deposition of LINDA SPIVEY
4    may be taken on the date and time specified
5    and in the action denominated herein before
6    Anna Tolleson, CSR, as Commissioner.
7        It is further stipulated that all
8    objections and assignment of grounds,
9    except as to the form of the question, are
10   reserved to the time of trial.
11       It is further stipulated that the
12   signature to and reading of the deposition
13   by the witness are waived, the deposition
14   to have the same force and effect as though
15   full compliance is had with all laws and
16   rules of court relating to taking
17   depositions.
18       It is further stipulated that notice of
19   filing this deposition is hereby waived.
20            --oOo--
21
22
23

**EXHIBIT**

B

Page 5

1    LINDA SPIVEY
2    was sworn and testified as follows
3    EXAMINATION BY MRS. MANNING
4    Q   Will you please state your full
5    name.
6    A   Linda F. Spivey.
7    Q   And what does the "F" stand for?
8    A   Faulk.
9    Q   Faulk. Can you spell that for me?
10   A   F-A-U-L-K.
11   Q   Is Faulk your maiden name?
12   A   Uh-huh.
13   Q   Okay. Ms. Spivey, my name is
14   Ashley Manning. We met just a moment ago.
15   I'm here today on behalf of Fred's Stores
16   of Tennessee, Incorporated, to ask you some
17   questions about the lawsuit that you have
18   filed against Fred's. Have you ever given
19   a deposition before?
20   A   No.
21   Q   Okay. Well, I guess just some
22   ground rules, so to speak. I'm just going
23   to be asking you questions today about this

Page 6

1    incident that's involved in your lawsuit.
2    If you need to take a break at any time,
3    that's fine. Just let me know or let your
4    attorney know. We'll be happy to take a
5    break at any time.
6        I'll just ask you that if I've asked
7    you a question before we take a break, if
8    you'll just go ahead and respond to that
9    question.
10       If you'll remember to answer out
11   loud with a verbal response instead of a
12   nod or shake of your head, that would be
13   great, because our court reporter is taking
14   down everything that we say today, and it's
15   difficult for her to take down nods and
16   shakes of your head. If you'll just try to
17   remember that, that will be great.
18       What is your date of birth,
19   Ms. Spivey?
20   A   February the 19th, 1944.
21   Q   And your Social Security number?
22   A   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.
23   Q   What is your current residence

Page 7

1    address?
2    A   1355 Daniel Branch Road, Highland
3    Home, Alabama 36041.
4    Q   Highland Home, is that a town
5    located near Montgomery, I guess?
6    A   It's just a spot in the road.
7    That's about right. It's got a post office
8    and all in it.
9    Q   Okay. Now, how long have you lived
10   at that address?
11   A   All my life.
12   Q   Does anyone live there with you?
13   A   No.
14   Q   Are you married?
15   A   I'm a widow.
16   Q   Widow, okay. Do you have any
17   children?
18   A   No.
19   Q   Now, do you have any relatives over
20   the age of 18 that live in the Montgomery
21   area?
22   A   I have a sister that lives close to
23   me.

Page 8

1    Q   Okay. And what is your sister's
2    name?
3    A   Betty Faulk.
4    Q   Now, does she work?
5    A   She has her own business at home.
6    Q   What's the name of that business;
7    do you know?
8    A   She runs chicken houses.
9    Q   Okay. Do you know what the name of
10   the business is?
11   A   It's the -- the business is Koch.
12   Q   Cots?
13   A   "Koch."
14   Q   Do you know how to spell that?
15   A   K-O-C-H, I believe is the way they
16   spell it.
17   Q   Now, is she married, your sister?
18   A   Her husband is dead.
19   Q   Do you have any nieces or nephews
20   in the area, in Montgomery?
21   A   Not close by.
22   Q   Okay. How close?
23   A   They're in Florida.

Page 9

1    Q    Okay.  Any other relatives in the
2  state of Alabama or in this area?
3    A    I have an aunt which is bedridden,
4  and cousins.  That's all.
5    Q    Do they live in the Montgomery
6  area?
7    A    No.  They -- well, some of them do
8  and some of them is in Crenshaw County.
9    Q    The reason I'm asking you this is
10  for purposes of striking a jury.  We
11  wouldn't want any of your family members on
12  the jury, obviously.  So I'm just going to
13  have you give me the names of those
14  relatives that live either in Montgomery
15  County or Crenshaw County since we're --
16  this case is actually in Federal Court.  So
17  the court that it's in encompasses several
18  different counties that surround
19  Montgomery, including Crenshaw County.  So
20  if you can, just give me the names of those
21  folks.
22    A    Judy Register lives here in
23  Montgomery.

Page 10

1    Q    What's her name again?
2    A    Judy Register.
3    Q    Register?
4    A    Uh-huh.
5    Q    Okay.  And what is her relation to
6  you?
7    A    First cousin.
8    Q    And now, is she -- does she work?
9    A    Yes.
10    Q    Do you know where?
11    A    She works above Montgomery.  She
12  works income tax.
13    Q    Okay.  Do you know the name of the
14  business?
15    A    No.
16    Q    Okay.  What other relatives?
17    A    And then I have a cousin in
18  Crenshaw County, Bobby Register.  Well, in
19  fact, there's several.
20    Q    Okay.  And now, is Bobby Register,
21  is he --
22    A    He's a cousin.
23    Q    He's a cousin.  And is he working?

Page 11

1    A    He works here in Montgomery.
2    Q    Do you know --
3    A    But I -- no.
4    Q    Any others?
5    A    Eddie Henderson.
6    Q    And is that a cousin as well?
7    A    Yes.
8    Q    Does Eddie work?
9    A    He drives a truck.
10    Q    Do you know the name of the
11  trucking company?
12    A    I think that's with -- I believe
13  with Spear Oil Company, I believe.  Then I
14  have a cousin in Troy, Sheila Register.
15    Q    Okay.  Sheila, does she work?
16    A    She works at the hospital.
17    Q    There in Troy?
18    A    Uh-huh.
19    Q    Do you know the name of the
20  hospital?
21    A    Troy Regional, I believe.
22    Q    Any other --
23    A    No, that's it.

Page 12

1    Q    Now, are you currently employed?
2    A    No.
3    Q    Were you employed at the time of
4  this incident at Fred's?
5    A    No.
6    Q    So you're not making a claim for
7  any lost wages in this case?
8    A    No.
9    Q    Have you ever been arrested?
10    A    No.
11    Q    Just a question I have to ask.
12  Have you ever filed for bankruptcy?
13    A    No.
14    Q    Have you ever been involved in any
15  other lawsuits other than this one?
16    A    No, no.
17    Q    So you've never been sued?
18    A    No.
19    Q    And you've never filed a lawsuit
20  against any individual or entity?
21    A    No.
22        MR. HARRISON:  Just for a second
23  off the record.

Page 13

1    (Discussion off the record.)
2    A  Yes.  When I worked at Vanity Fair
3  in Luverne, yeah.
4    Q  Okay.  So you previously worked for
5  Vanity Fair down in Luverne?
6    A  Yes.  Until they closed.
7    Q  Oh.  Okay.  What did you do for
8  them?
9    A  I sewed, seamstress.
10    Q  Okay, seamstress.  How long were
11  you employed with Vanity Fair?
12    A  I don't know.
13    Q  Okay.  Was it more than ten years?
14    A  Oh, it was less than that.
15    Q  Less than that?
16    A  Yes.
17    Q  Did you suffer an on-the-job
18  injury?
19    A  Yes, I did.
20    Q  Okay.  Tell me about that.
21    A  I turned to my right to pick up a
22  bundle of the material that I sewed, and it
23  did something to my back.  And they sent me

Page 14

1  to rehab for six weeks, which I got over
2  it.  I got better.
3    Q  And did you file a claim for
4  worker's Comp?
5    A  Well, Workmen's Comp, yeah, they
6  did.
7    Q  Did that result in a lawsuit?  Any
8  sort of Worker's Compensation lawsuit or
9  was that --
10    A  It didn't go to court or nothing
11  like that, no.  It was just a short thing.
12    Q  Okay.  Where did you undergo that
13  rehab?
14    A  Here in Montgomery.  Yeah,
15  Montgomery, out on Narrow Lane Road, that
16  rehab hospital.
17    Q  Do you know the name of that
18  hospital, the rehab hospital?
19    A  All I know it's just a rehab.  Now,
20  it may be changed since I went there
21  because that's been a long time back.
22    Q  When was that?
23    A  That was back in the '80s.

Page 15

1    Q  The early 1980s?
2    A  Late '80s.
3    Q  Late '80s.  And you underwent
4  physical therapy for six weeks?
5    A  Yes.
6    Q  Did you have to see a doctor for
7  that injury?
8    A  Yes.
9    Q  Do you remember the name of the
10  doctor?
11    A  I do not.
12    Q  Were you off work for a period of
13  time?
14    A  Yes.
15    Q  Do you know how long?
16    A  Probably ten weeks.
17    Q  Did you return to work after that?
18    A  No.
19    Q  Did you return to work in any
20  capacity or did you just --
21    A  No.
22    Q  Okay.  So that was -- the last time
23  you worked was when you worked for Vanity

Page 16

1  Fair?
2    A  Yes.
3    Q  Now, what was your reason for not
4  returning to work at that time?
5    A  Because I wasn't able.
6    Q  Was it related to your back injury?
7    A  Yeah, my back.
8    Q  Did you injure any other part of
9  your body?
10    A  No.
11    Q  Did you injure your shoulder?
12    A  No.  Nothing but my back.
13    Q  What part of your back did you
14  injure?
15    A  Lower back.
16    Q  Have you required treatment for
17  your low back injury since that time?
18    A  I've had back surgery since then.
19    Q  When did you have back surgery?
20    A  '94.
21    Q  Where was that performed?
22    A  Montgomery.
23    Q  Who was your doctor?

Page 17

1    A   Hackman.
2    Q   And where was your surgery
3  performed?
4    A   Montgomery.
5    Q   I know, but what hospital?
6    A   Jackson.
7    Q   Jackson Hospital.  Did you require
8  rehab after that surgery, or physical
9  therapy?
10   A   No.
11   Q   How did you recover after that
12 surgery?
13   A   I did okay.
14   Q   Have you had any problems with your
15 back since 1994?
16   A   No.
17   Q   Have you been treated for your back
18 since that time?
19   A   No.
20   Q   So the last time you sought any
21 treatment for your back was in
22 approximately 1994?
23   A   Right.

Page 18

1    Q   Or at the time of that surgery?
2    A   Yes.
3    Q   Okay.  Any other on-the-job
4  injuries?
5    A   No.
6    Q   Tell me about your education
7  background.  Did you go to high school?
8    A   I finished high school.
9    Q   Okay.  Where did you go to school?
10   A   Highland Home.
11   Q   Highland Home.  And then any more
12 schooling after that?
13   A   No.
14   Q   You ever served in the military?
15   A   No.
16   Q   Now, are you on any medication
17 today?
18   A   I'm on a blood pressure pill.
19   Q   Does that medication affect your
20 ability to understand the questions that
21 I'm asking?
22   A   No, no.
23   Q   What's the name of that blood

Page 19

1  pressure medication?
2    A   Diovan.
3    Q   How long have you been on Diovan?
4    A   About two years.
5    Q   Do you have a doctor that
6  prescribed that to you that you regularly
7  see?
8    A   Yes.
9    Q   Who is that?
10   A   Dr. Kathryn Middleton.
11   Q   Where is Dr. Middleton located?
12   A   Baptist South.
13   Q   Is that who -- is that your primary
14 doctor?
15   A   That's my regular doctor, medical
16 doctor.
17   Q   Have you ever made a claim for
18 Social Security disability benefits?
19   A   I get Social Security.
20   Q   Okay.  But have you -- before you
21 began receiving Social Security, had you
22 ever made a claim for Social Security
23 disability benefits before that time?

Page 20

1    A   I filed for it.
2    Q   Okay.  When was that?
3    A   In '90 I -- '90.
4    Q   1990?
5    A   Yeah.
6    Q   Was that as a result of your back
7  injury?
8    A   Yes.
9    Q   And did you begin receiving Social
10 Security benefits at that time?
11   A   Yes, in '91.
12   Q   Did you have an attorney who
13 handled that for you?
14   A   Yes.
15   Q   Who was that?
16   A   Hickman.
17   Q   Hickman?
18   A   Greenville.
19   Q   In Greenville, Alabama?
20   A   (Witness nods head.)
21   Q   Do you remember his or her first
22 name?
23   A   I think John.

Page 21

1    Q    And you're currently receiving that
2    monthly benefit at this time?
3    A    Yes.
4    Q    Okay.  How much is that?
5    A    It's 643.
6    Q    Per month?
7    A . Yes.
8    Q    Now, I want to talk with you now
9    about this incident at Fred's.  Do you
10   recall the date of this incident?
11   A    November the 11th, 2006.
12   Q    And do you recall what day of the
13   week that was?
14   A    Saturday.
15   Q    Saturday.  And where did this
16   incident take place?  Which Fred's?
17   A    Montgomery.
18   Q    Which Fred's location?
19   A    It's -- it's that one on the
20   bypass.
21   Q    Okay.  The Eastern Boulevard
22   location?
23   A    Yes.

Page 22

1    Q    Now, were you a regular customer of
2    Fred's?
3    A    I go to Fred's a lot, and did, but
4    I go -- I went -- I use Luverne and
5    Greenville because I'm closer, but I had
6    been in this store a few times.
7    Q    So you usually would go to the
8    stores in Luverne?
9    A    They're closer to me.  I use
10   Fred's, but the reason I -- that day I had
11   to come to Montgomery to get my medicine at
12   the drugstore, and what I wanted -- I said,
13   well, while I'm up here, I'll run out here
14   to Fred's and see if they've got it.
15   Q    What was it that you wanted?
16   A    I wanted some Christmas baskets.
17   Q    Now, how far from where you live is
18   this Fred's located?  How long would it
19   take you to get there?
20   A    It's about 40 miles.
21   Q    But you were already coming to
22   Montgomery that day to pick up your
23   prescription?

Page 23

1    A    Yes, yes.
2    Q    Where do you pick up your
3    prescriptions in Montgomery?
4    A    CVS.
5    Q    Which CVS is that?
6    A    Narrow Lane Road.
7    Q    Is that where you get all of your
8    prescriptions filled?
9    A    Yes, at CVS.
10   Q    On Narrow Lane Road?
11   A    Yes.
12   Q    Was anyone with you that day when
13   you came to Montgomery and went to Fred's?
14   A    No.
15   Q    So you drove yourself?
16   A    Yes.
17   Q    Now, did you go to get your
18   prescriptions first or did you go to Fred's
19   first?
20   A    I picked up my prescription first.
21   Q    Were you under any time
22   constraints?
23   A    No.

Page 24

1    Q    And then did you go straight from
2    CVS to Fred's?
3    A    Yes.
4    Q    Tell me what happened next.
5    A    When I got to Fred's, I walked in
6    and the buggies is sitting here on the
7    left, and I went and got a buggy.  And one
8    of the ladies, the cashier, happened to be
9    standing there and she asked me, says, "Can
10   you help -- can I help you?"  And I asked
11   her, I said, "Do y'all have those little
12   Christmas baskets?"  She says, "Follow me.
13   I'll show you what we got."  And I did.
14       I followed her back there.  We
15   looked at the baskets, came on back up the
16   aisle, and I picked up a thing or two.  And
17   I came back to the front where the sweaters
18   and the blue jeans was, was over close to
19   the wall.  I stopped there and looked at
20   the sweaters, and I picked me out a sweater
21   and put it in the buggy, and the blue jeans
22   was over from the sweaters.  And I pushed
23   my buggy on a little further.

Page 25

```
 1        I had both hands on my buggy, and I
 2   looked around at the blue jeans. I was
 3   stopped. And I was looking at the blue
 4   jeans and I was fixing to go over there
 5   where they was, and I heard something. And
 6   it was -- made the worst racket, and I said
 7   to myself, what in the world is that?
 8        I've still got ahold of my buggy.
 9   And it got closer and it got louder. And I
10   looked up and this picture frame come
11   across, hit me right here in my face, and
12   landed on my shoulder, and I froze to the
13   buggy.
14        And I didn't know what had hit me,
15   and when I finally come to my senses, I
16   looked down to see what had hit me, and
17   there was glass all over the floor and
18   right after then, there's a lady come up to
19   me and asked me, said, "Are you hurt?" And
20   I said, "Yes, I am."
21        And she goes back up there and gets
22   that same lady, cashier, and brought her to
23   me. And she then -- she asked me, said,
```

Page 26

```
 1   "Are you hurt?" I said, "Yes, I am." And
 2   then she goes and gets her a paper and
 3   files accident report.
 4      Q   How long were you in the store
 5   before this happened?
 6      A   I walked in and walked back there
 7   with her, came back up the aisle, and
 8   picked up -- I think it was some candy I
 9   picked up. And I come right on back up
10   towards the front and was looking at the
11   sweaters and blue jeans. So that couldn't
12   have been very long.
13      Q   Less than five minutes?
14      A   Oh, it was longer than that.
15   Probably -- I would say 15 minutes.
16      Q   And you were pushing a buggy?
17      A   Yes, I had my buggy.
18      Q   And when you walked to the back of
19   the store to look at the --
20      A   Well, it wasn't at the back. It
21   was probably the center.
22      Q   Was it on an aisle, though?
23      A   Yes, we went down the aisle.
```

Page 27

```
 1      Q   And y'all were looking for the
 2   Christmas baskets?
 3      A   Yes.
 4      Q   And were there a lot of Christmas
 5   decorations in the area?
 6      A   I didn't pay no attention to all of
 7   that because when I went in there, there
 8   was -- you know, to look at the Christmas
 9   baskets, and they didn't have them. So I
10   came back up the aisle and --
11      Q   Did that employee go with you back
12   up the aisle?
13      A   I think she followed me back up the
14   aisle.
15      Q   Now, where was the apparel or the
16   clothing items that you were looking at in
17   relation to the front door?
18      A   When you come in at the front door
19   where the baskets -- the buggies sitting
20   here, right there is where -- to the left
21   is where the blue jeans and the sweaters
22   and the clothes are (indicating).
23      Q   So in front of where the buggies
```

Page 28

```
 1   are kept?
 2      A   Back to the left.
 3      Q   So you had a couple of items in
 4   your buggy at that time? Candy items?
 5      A   Yes.
 6      Q   Okay. And you were still pushing
 7   your buggy?
 8      A   Right. I came on back up to the
 9   front and I, you know, saw the sweaters and
10   the blue jeans, and, like I said, I picked
11   out a sweater and put in my buggy and was
12   going to get me a pair of blue jeans. And
13   when I looked over there and saw the blue
14   jeans and fixing to go where the blue jeans
15   was, that's when I heard the racket.
16      Q   You mentioned there was a wall in
17   the area?
18      A   The wall was right over there where
19   the blue jeans and the sweaters was. When
20   you walk in, you take -- over to the left,
21   there's a wall there, and that side of the
22   wall is where the blue jeans and sweaters
23   and things was.
```

Page 29

1    Q    Were they on racks, hanging racks?
2    A    They were on racks, yes.
3    Q    Were they clothes that were hanging
4  or were they folded up on racks?
5    A    They were hanging on the racks --
6    Q    And were the racks --
7    A    -- on the bar thing, whatever you
8  call them. They were hanging up.
9    Q    And the bars or racks were on the
10  wall?
11    A    No, they wasn't on the wall. They
12  were back on the side of the wall, up close
13  to the wall.
14    Q    Were they those circular racks that
15  you hang clothes on?
16    A    Long ones.
17    Q    The long ones. But they weren't up
18  flush against the wall? Is that what
19  you're saying?
20    A    They wasn't exactly right up
21  against it, you know.
22    Q    Okay. When you claim that you
23  heard this racket, where were you standing

Page 30

1  at that point?
2    A    Like I said, I had picked up a
3  sweater and put it in my buggy. I had
4  pushed my buggy just a little piece
5  further, still had my hands on it, and
6  right to the left, right where I was
7  standing was the blue jeans, and I never
8  did get to them. I looked around and there
9  was the blue jeans. That's when I heard
10  the racket.
11    Q    Okay. And then you testified that
12  you heard a racket, and then you looked up
13  and you were hit in the face and the
14  shoulder?
15    A    When I heard the racket, I said,
16  "What in the world is that?" And I could
17  tell it was something getting closer to me.
18  And when I looked up, that's when it come
19  down in my face, across my chin, and hit my
20  shoulder.
21    Q    Where are you claiming it fell
22  from?
23    A    I couldn't tell you. It had to

Page 31

1  come off of the shelf or either somebody
2  throwed it at me.
3    Q    Are you claiming that somebody
4  threw something at you?
5    A    No, no, I'm not. Because I could
6  not tell you where that picture frame come.
7  It had to come off of the wall. There's
8  shelves on the wall.
9    Q    There was a shelf on the wall?
10    A    Oh, sure. Where the picture frames
11  was.
12    Q    That was my next question. Were
13  there other picture frames on that shelf?
14    A    Yes.
15    Q    How high was this shelf?
16    A    Well, it's a pretty good piece
17  above, you know, where they have their
18  stuff. If you've ever been to a Fred's,
19  you know about how high the shelves are.
20    Q    How many shelves were on that wall?
21    A    I think it was one.
22    Q    Was that shelf just dedicated to
23  picture frames?

Page 32

1    A    I'm not sure about that.
2    Q    Is that all you saw on that shelf?
3    A    Yes.
4    Q    How many frames were on the shelf?
5    A    I do not know.
6    Q    When you were looking at the
7  clothing in the area, did you notice that
8  there was a shelf with picture frames on
9  it?
10    A    I did not.
11    Q    Was it a shelf that was on the
12  wall, though?
13    A    Yes.
14    Q    Was it something that if you had
15  looked at the wall, you would have seen
16  that there was a shelf?
17    A    Yes. You had to look up.
18    Q    How high up would you have to look?
19    A    You have to look up like that
20  (demonstrating).
21    Q    And there was only one shelf there?
22    A    As far as I know.
23    Q    Okay. I'm going to let you, if you

Page 33

1   will, just draw for me -- and I'm not going
2   to hold you to your artwork.  But if you'll
3   just draw for me where you came into the
4   store and where you were standing when this
5   incident happened.
6      A   I can't draw good.
7      Q   That's okay.
8      A   I'm going to do the best I can.  If
9   you can't understand it the way I'm trying
10  to tell you and if you can't understand it
11  like this -- if you can't, I'm sorry.
12     Q   We're going to try.
13     A   I'm telling you the truth.
14     Q   Show us where you came in.
15     A   All right.  This is the front door.
16  I come in right here.  I'm going to try to
17  draw you the best I can.  Over here -- I'm
18  just going to go down this way.  And I'm
19  going to come down this way -- that ain't
20  right.  I'm sure it might be.  Okay.
21         And right along here is where that
22  lady was standing, and here's the buggies.
23  And I go in and get a buggy and ask that

Page 34

1   lady about the picture -- I mean the
2   Christmas baskets.  Okay.
3         And then goes down the aisle and
4   then I come back up the aisle.  And, like I
5   said, I picked up, you know, a few things
6   and then I come on back to the front.  I
7   come on back this a way and right along
8   here -- okay, now, here's the shelf.
9   Here's the shelf. (Drawing.)
10     Q   Is that the wall?
11     A   Wall.  And that's the shelf and
12  here's the -- I don't even remember what
13  else is up there besides picture frames.
14  And right here I stopped and here was the
15  sweaters, and I got me a sweater and then
16  they had these racks like this hanging.
17  (Drawing.)
18     Q   And those were where the blue jeans
19  were?
20     A   The blue jeans is right here,
21  sweaters right here (indicating).  I got me
22  a sweater, and I stopped right there, and I
23  was fixing to come around and look at the

Page 35

1   blue jeans.  When I did -- still holding
2   onto my buggy -- I heard this loud racket.
3   And I said, "What in the world is that?"
4   And then it got closer to me, I reckon, and
5   I knew it was above my head.  And when I
6   looked up to see what it was, it was that
7   quick.  It done hit me across here and hit
8   me on the shoulder (indicating).
9      Q   Okay.  So let me -- I'm just going
10  to write right here "Buggies" if that's
11  where you were saying the buggies were.
12  Right?
13     A   Huh-uh.  Wait a minute.
14     Q   You came in here?
15     A   Yeah.
16     Q   Buggies were right here?
17     A   Yeah, that's where I come in.
18  Buggies here (indicating).
19     Q   Sweaters were right here?
20     A   And blue jeans here (indicating).
21     Q   Blue jeans here?
22     A   Yeah.
23     Q   All right.  And then this was a

Page 36

1   wall?
2      A   Right.
3      Q   Okay.  I'm just going to mark that
4   so we'll know -- when we look at this
5   later, just what you were drawing on here,
6   okay?  This little dot right here, that's
7   you.  That's where you were claiming you
8   were standing; right?
9      A   Uh-huh.
10     Q   Okay.  I'm just going to make an
11  "X" right there.  That way we can know
12  that's where you say you were standing,
13  okay?  And this right here represented the
14  cashier?
15     A   Yeah.  She was standing there.
16     Q   Okay.
17     A   And she went back with me.
18     Q   Right.  When you stopped right
19  here, you were holding onto your buggy?
20     A   Uh-huh.
21     Q   How far were you from this wall?
22     A   Oh, I was a pretty good little
23  piece from the wall.

Page 37

1    Q    Several feet?
2    A    About as far as between Brett and
3    him was the wall.
4    Q    Okay.  So maybe about five feet or
5    so between Brett and Eric?
6    A    Something like that.
7        MR. HARRISON:  So from me to
8    him?
9        THE WITNESS:  Uh-huh.
10        MR. HARRISON:  This distance?
11        THE WITNESS:  No.  Between Eric
12    to that wall over there.
13        MR. HARRISON:  Six feet?  Five
14    feet?
15    Q    (By Mrs. Manning) Okay.  Six or
16    eight feet, something like that?
17    A    Uh-huh.
18    Q    And that's how far away from the
19    wall --
20    A    Yeah.
21    Q    -- you were -- you stated you were
22    standing?
23    A    Uh-huh.

Page 38

1    Q    Okay.  Were you facing that wall
2    when this happened?
3    A    Yes.  I was.  I was standing just
4    like this with my buggy and that's the wall
5    (indicating).
6    Q    And so the buggy was essentially
7    between you and the wall?
8    A    Sure.
9    Q    And you testified you heard a
10    racket?
11    A    I did.
12    Q    What did it sound like?
13    A    Oh, I don't know.  It sounded like
14    a freight train, loud noise.  It just
15    stunned me.  I couldn't understand what
16    that racket was.
17    Q    And at that point, you looked up?
18    A    When I looked up -- you see, as it
19    got closer, it got louder, and that's when
20    I looked up and that's when I knew it was
21    above my head.  And that's when it
22    scratched me across my face.
23    Q    What is it that you claim was

Page 39

1    causing all of the noise?
2    A    I didn't know what was causing it.
3    Q    Did the shelf fall or did anything
4    else fall?
5    A    The shelf, no, did not fall.  The
6    only thing fell was that big picture frame.
7    Q    So it was just one frame that fell?
8    A    Right.
9    Q    And you testified that it hit you
10    in the face and then the shoulder?
11    A    Hit me right across here
12    (indicating) and landed on my shoulder
13    right there.  It was black.
14    Q    On your right shoulder?
15    A    Yes.
16    Q    So it was the right side of your
17    face?
18    A    Uh-huh.
19    Q    And your right shoulder?
20    A    Uh-huh.
21    Q    When did you first realize it was a
22    picture frame?
23    A    When I looked down -- as it hit me,

Page 40

1    I looked down to see what had hit me, and I
2    seen all that glass and then one of the
3    boys --
4    Q    So you saw glass on the floor?
5    A    Yes.
6    Q    What else did you see on the floor?
7    A    That frame.
8    Q    The frame.  Describe that frame for
9    me.
10    A    It was a frame about like that
11    (indicating) both ways.
12    Q    What size frame would you estimate
13    it was?
14    A    I can't -- I don't know.
15    Q    An 8 by 10 frame?
16    A    It was a frame about this big, a
17    huge frame (demonstrating).
18    Q    And you're holding your hands out.
19    What, about 12 inches or so?
20        MR. HARRISON:  It might be a
21    little more than 12.
22    Q    16 inches?
23    A    I would think so.

Page 41

1    **Q**   Do you recall what the frame looked
2    like?
3    **A**   It was a brownish looking, goldish
4    looking around the glass.  I recall the boy
5    in the Fred's, I know he took two buggies
6    to -- he went in there and picked it up.
7    **Q**   Okay.  We'll talk about that in
8    just a minute.  But you looked down and you
9    saw the glass on the floor?
10   **A**   Yes.
11   **Q**   And the frame?
12   **A**   Yes.
13   **Q**   And you just saw the one frame;
14   right?
15   **A**   Right.
16   **Q**   Did you look anywhere else on the
17   floor?
18   **A**   No.  Because I --
19   **Q**   Did you see anything else on the
20   floor other than just the one frame?
21   **A**   No.
22   **Q**   Did you look up on the shelf?
23   **A**   No.

Page 42

1    **Q**   So you don't know if anything else
2    fell?
3    **A**   Not on me, it didn't.
4    **Q**   Okay.  Were there any other
5    customers in the area at this time?
6    **A**   I don't recall any around me.
7    **Q**   How many items did you have in your
8    buggy right before this happened?
9    **A**   I know I had the sweater, and I had
10   some candy and maybe two or three other
11   little items.
12   **Q**   Did your buggy bump into anything?
13   **A**   No.
14   **Q**   Didn't bump into the wall?
15   **A**   No.
16   **Q**   And you didn't notice any other
17   customers in the area?
18   **A**   Not until that -- after that hit
19   me, this lady came in and came up to me --
20   I guess she was a customer -- and asked me
21   if I were hurt.  And she's the one that
22   went up there and got the cashier.
23   **Q**   Did she say that she saw this

Page 43

1    happen?
2    **A**   She did not say.
3    **Q**   So you don't know one way or the
4    other if she saw it happen?
5    **A**   I don't think she did because this
6    has done happened when she come up to me.
7    **Q**   Do you know if any other customers
8    had been in the area looking at those
9    picture frames?
10       MR. HARRISON:  Objection.  You
11   can answer, though.
12   **A**   I do not know.
13   **Q**   Did you see any other customers
14   pick up any of those picture frames off
15   that shelf?
16   **A**   No.
17   **Q**   Did you look at that wall or that
18   shelf at all before this happened?
19   **A**   No.
20   **Q**   So before this happened, were you
21   aware that there were frames on that wall?
22   **A**   I didn't go in there looking for
23   picture frames.

Page 44

1    **A**   Well, I understand that.  My
2    question is:  Before this happened, had you
3    looked at that wall?
4    **A**   No.
5    **Q**   Okay.  So you were not aware that
6    there were picture frames on that wall?
7    **A**   No.  Not until this happened.
8    **Q**   You testified earlier that you
9    heard a racket and then you looked up and
10   you were hit in the face.  Did you
11   immediately look around to see what may
12   have been causing the sound that you heard?
13   **A**   No.  When that hit me -- like I
14   said, I still had ahold of my buggy, and
15   when that hit me, I didn't know what had
16   hit me until I looked down on the floor.
17   **Q**   I'm trying to get an idea how much
18   time passed between -- you stated you heard
19   this loud sound --
20   **A**   It wasn't but just a few seconds.
21   **Q**   And where were you looking at that
22   point?
23   **A**   Like I said, I was looking at the

Page 45

1  blue jeans and fixing to go around where
2  the blue jeans was when I heard this
3  racket. And from that time, it was a few
4  seconds. I looked up and that's when it
5  hit me.
6      Q   Would you have been able to reach
7  up and pull one of these picture frames off
8  of that shelf?
9          MR. HARRISON: Objection.
10     A   No.
11     Q   Would it have required a ladder or
12 help to get an item off of this shelf?
13         MR. HARRISON: Objection.
14     A   Yes.
15     Q   Okay. Did you see any ladders in
16 the area?
17     A   No.
18     Q   Do you know if any other customers
19 may have climbed up to retrieve this
20 picture frame and then put it back on the
21 shelf?
22         MR. HARRISON: Objection.
23     A   I don't know.

Page 46

1      Q   Would you agree with me that it's
2  possible another customer could have picked
3  up the picture frame and then put it back
4  up on the shelf and it may not have been up
5  there securely?
6          MR. HARRISON: Objection.
7      A   I don't know.
8      Q   Were there any employees on the
9  aisle or in the area where you were at that
10 time?
11     A   No.
12     Q   So it's your testimony that you did
13 not notice the picture frames in the area
14 until after this happened?
15     A   No.
16     Q   Did you have any conversations with
17 any of the store employees after this
18 happened?
19     A   The cashier is the only one that I
20 talked to.
21     Q   And that was a female cashier?
22     A   Yes.
23     Q   Do you know her name?

Page 47

1      A   I do not.
2      Q   Can you describe her for me?
3      A   She was a black lady. She wasn't
4  real tall. Normal height.
5      Q   Do you know her approximate age?
6      A   I don't know.
7      Q   Was she a younger lady?
8      A   She was a younger lady.
9      Q   Tell me about that conversation
10 with her.
11     A   She asked me if I was going to the
12 emergency room, and I said, "Yes." Seemed
13 like she mentioned the manager or
14 something. And I waited around in there a
15 little bit for the manager to come and talk
16 to me. He never showed his face.
17     Q   Do you know the manager's name?
18     A   I do not.
19     Q   Did you ask to speak with the
20 manager?
21     A   When I went to the emergency room,
22 my doctor told me when I got home to call
23 and speak with the manager.

Page 48

1      Q   And did you do that?
2      A   I did.
3      Q   Tell me about that conversation.
4      A   He was rude to me.
5      Q   What did he say?
6      A   Very short talking.
7      Q   What did he say?
8      A   He wanted to blame me with it. He
9  asked me was I over there trying to get the
10 picture frame down.
11     Q   What did you say?
12     A   I told him, "I didn't go in there
13 to get a picture frame."
14     Q   Did you ever handle any of the
15 picture frames in the store that day?
16     A   No.
17     Q   Didn't have any picture frames in
18 your buggy?
19     A   No.
20     Q   Did any of the store employees say
21 anything to you that day that would give
22 you reason to believe that they knew that
23 that frame might fall from the shelf?

Page 49

1    A   No.
2    Q   Or that it wasn't secure?
3    A   No.
4    Q   Do you have any information that
5    the store or any of the employees had any
6    notice that this frame could fall?
7         MR. HARRISON:  Objection.
8    A   I do not know.
9    Q   But nobody -- none of the employees
10   said anything to you that indicated they
11   had any notice that this could fall from
12   the shelf?
13   A   No, no.
14   Q   When did the conversation with the
15   cashier take place?
16   A   Right after it happened.
17   Q   Was it after the customer came over
18   to you?
19   A   Yes.
20   Q   Okay.  And then what?  Were you
21   talking with the customer and the
22   cashier --
23   A   The customer -- after all this

Page 50

1    happened, I guess she saw me standing there
2    and she come up and asked me if I were
3    hurt.
4    Q   And that's the customer you're
5    talking about?
6    A   I guess she was a customer.
7    Q   Do you know her name?
8    A   No.
9    Q   Did you get her name --
10   A   No.
11   Q   -- that day?
12   A   No.
13   Q   It was a female?
14   A   Right.
15   Q   Okay.  And then the cashier --
16   A   That's -- she's the one that went
17   and got the cashier and she came over and
18   filed an accident report.
19   Q   What makes you say she filed an
20   accident report?
21   A   She had a paper in her hand because
22   she told me she's got to file an accident
23   report.

Page 51

1    Q   Did she fill out the paper?
2    A   Yes, ma'am.
3    Q   Did she ask you any questions?
4    A   Yes.
5    Q   What type of questions?
6    A   My name and address, such as that.
7    Q   Did you ever see a copy of that
8    report?
9    A   No.
10   Q   Did you get that cashier's name?
11   A   No.
12   I think you had said no.  Okay.
13   Have you had any conversations with that
14   cashier since that time?
15   A   No.
16   Q   What about the store manager?
17   A   No.
18   Q   Did you have any conversations with
19   any other employees in the store that day?
20   A   No.
21   Q   So the cashier was the only person
22   that you talked to?
23   A   Yes.

Page 52

1    Q   And then the customer?
2    A   Yes.
3    Q   Have you talked to that customer
4    since this incident?
5    A   No.
6    Q   Have you been back to that Fred's
7    since that incident?
8    A   No.
9    Q   After you were hit in the face and
10   the shoulder, did you just remain standing
11   there for a period of time?
12   A   I did, yes, for a minute.
13   Q   So you didn't fall down to the
14   floor?
15   A   No.
16   Q   Were you bleeding at all?
17   A   No.
18   Q   Did you lose consciousness at all?
19   A   No.
20   Q   Did you ask for an ambulance?
21   A   No.
22   Q   Did anyone offer to get you an
23   ambulance?

Page 53

1    A   No.
2    Q   Did you drive away from the store
3  that day?
4    A   I did, yes.
5    Q   Where did you go when you left?
6    A   Baptist South Hospital.
7    Q   To the emergency room?
8    A   Yes.
9    Q   Did you go straight to the
10  emergency room?
11   A   Yes.
12   Q   What time of day was this that this
13  happened?
14   A   About 11:00.
15   Q   A.m.?
16   A   Uh-huh.
17   Q   Okay.  And what treatment did you
18  receive at the emergency room?
19   A   They did x-rays.
20   Q   Do you know the results of those
21  x-rays?
22   A   I do not.
23   Q   What did they tell you?

Page 54

1    A   And they gave me pain pills.  Like
2  I said, that doctor at the emergency room
3  told me that I needed to talk to Fred's
4  manager and that I needed to see my doctor.
5    Q   Your regular doctor?  Your treating
6  doctor?
7    A   Yes.
8    Q   Do you know the name of the doctor
9  at the emergency room who you saw?
10   A   I don't remember.
11   Q   So they did x-rays and they gave
12  you pain medicine?  What kind of treatment
13  did you receive for your face?
14   A   They did x-rays.
15   Q   Do you know what those x-rays
16  revealed?
17   A   No.
18   Q   What about -- did they x-ray your
19  shoulder?
20   A   Yes.
21   Q   Okay.  What did that reveal?
22   A   I do not know.
23   Q   Do you know what your diagnosis was

Page 55

1  that day?
2    A   No.
3    Q   Were you admitted to the hospital?
4    A   No.
5    Q   So you were sent home that day?
6    A   Yes.
7    Q   Any other medications other than
8  the pain medicine?
9    A   Not that day.
10   Q   Did you get any shots?
11   A   Later.
12   Q   At the ER that day.  That's what
13  I'm asking.
14   A   No.
15   Q   Okay.  And the doctor told you to
16  follow up with your doctor?
17   A   Yes.
18   Q   Who was your doctor at the time?
19   A   Dr. Middleton.
20   Q   When did you follow up with
21  Dr. Middleton?
22   A   The first of the week.
23   Q   This incident happened on a

Page 56

1  Saturday?
2    A   Yes.
3    Q   And so you followed up with Dr.
4  Middleton the first part of the week?
5    A   Yes.
6    Q   Okay.  And what treatment did you
7  receive from Dr. Middleton?
8    A   He had MRI done on me.
9    Q   On your shoulder?
10   A   Yes.
11   Q   Do you know what the results of
12  that MRI showed?
13   A   No, no.
14   Q   Do you know what you were diagnosed
15  be?
16   A   Then she sent me to Dr. Hackman.
17   Q   What kind of doctor is Dr. Hackman?
18   A   He's a neurosurgeon.
19   Q   He did your back surgery?
20   A   Yes.
21   Q   Okay.  When did you see Dr. Hackman
22  for the first time?
23   A   I don't remember.  It could have

Page 57

1  been the next week.
2    Q   Okay.  And what treatment did you
3  receive from Dr. Hackman?
4    A   Dr. Hackman did a bone scan.
5    Q   And what did that reveal?
6    A   He said that I had a bad shoulder.
7  He then sent me to have a nerve test done,
8  and then he sent me to Dr. Hartzog.
9    Q   What were the results of your nerve
10  test?
11    A   They said that I had damaged nerves
12  down my arm on my shoulder.
13    Q   What about Dr. Hartzog?
14    A   Dr. Hartzog said that I had a tear
15  in my roller cup.  He also made x-rays.
16    Q   A tear in your rotator cuff?
17    A   Uh-huh.  Roller cup, or whatever
18  you call it.
19    Q   When did you initially see
20  Dr. Hartzog in relation to this incident?
21    A   I don't recall the dates.  I mean,
22  I --
23    Q   Was it --

Page 58

1    A   It was shortly in between this
2  period of time with all these doctors.
3    Q   So Dr. Middleton sent you to Dr.
4  Hackman?
5    A   Right.
6    Q   And then Dr. Hackman sent you to
7  Dr. Hartzog?
8    A   Yes.
9    Q   Okay.  What treatment have you
10  received from Dr. Hartzog?
11    A   Dr. Hartzog had to give me shots in
12  my shoulder, and he put me on pain pills,
13  one every four hours, which -- I'm still on
14  them.
15    Q   Okay.  So you had shots in your
16  shoulder?
17    A   Yes.
18    Q   How many of those did you receive?
19    A   I don't -- I don't recall.  I still
20  have to get shots.  Dr. Middleton gives me
21  shots, too, for that.
22    Q   When is the last time you had a
23  shot for your shoulder?

Page 59

1    A   I don't know.
2    Q   Was it within the last month?
3    A   Maybe two months.
4    Q   What type of pain medicine are you
5  on?
6    A   Hydrocodone.
7    Q   How often do you take that?
8    A   One every four hours.
9    Q   And you're currently on that?
10    A   Ma'am?
11    Q   You're currently taking that?
12    A   I am.
13    Q   Are you taking that today?
14    A   Yes, I am.
15    Q   So that's another medicine that
16  you're taking in addition to your blood
17  pressure medicine?
18    A   Yes.
19    Q   You've been on this hydrocodone for
20  how long?
21    A   Ever since this happened.
22    Q   So it's November 2006?
23    A   Yes, yes.

Page 60

1    Q   And Dr. Hartzog prescribes that for
2  you?
3    A   Yes.
4    Q   When is the last time you saw
5  Dr. Hartzog?
6    A   It's been a few months back.
7    Q   What did he tell you at that time?
8    A   That I was -- that I would have to
9  have surgery.
10    Q   On your shoulder?
11    A   Yes.
12    Q   Have you scheduled that surgery?
13    A   No.
14    Q   And why is that?
15    A   I don't know.
16    Q   Did doctor Hartzog recommend that
17  surgery?
18    A   Dr. Hartzog would be the one to do
19  it.
20    Q   And you haven't seen him in a few
21  months?
22    A   Yes.
23    Q   When is the last time you saw

Page 61

1  Dr. Middleton?
2     A  Last week.
3     Q  Okay.  What treatment did you
4  receive at that time?
5     A  She keeps a check on me, on my
6  shoulder okay.
7     Q  What did she tell you last week?
8     A  She said that them nerves in my --
9  I was telling her, you know, I was just
10  having a lot of trouble with my shoulder
11  and my arm and my hand going to sleep, and
12  she said, "You've just got damaged nerves
13  in there.  You've got to live with it."
14     Q  Did she prescribe any new
15  medications at that time?
16     A  No.  She told me to keep taking the
17  hydrocodone.
18     Q  Did she have any discussion with
19  you about surgery?
20     A  Well, she said that -- she already
21  knew that Dr. Hartzog said that I was going
22  to have to have a surgery.
23     Q  And you said that surgery has not

Page 62

1  been scheduled?
2     A  No.
3     Q  Are you going to schedule that
4  surgery?
5     A  Yes.
6     Q  When?
7     A  I do not know.
8     Q  Okay.  But the last time you talked
9  to Dr. Hartzog was in November or so, the
10  fall; is that right?
11     A  Yes.
12     Q  Did he recommend surgery or did he
13  just say that --
14     A  He said that I would have to have
15  it.  That I could not get by without it.
16     Q  When is your next appointment with
17  Dr. Hartzog?
18     A  When I get ready to make an
19  appointment.
20     Q  So you don't have anything
21  scheduled with him?
22     A  No.
23     Q  When is your next appointment with

Page 63

1  Dr. Middleton?
2     A  Next week.
3     Q  How often do you see Dr. Middleton?
4     A  I see her every three to four
5  weeks.
6     Q  And what all does she treat you
7  for?
8     A  My high blood.  She keeps my
9  prescriptions.
10     Q  Your high blood pressure?
11     A  Yes.
12     Q  Anything else?
13     A  No.
14     Q  Have you been back to see
15  Dr. Hackman?
16     A  Not since he did all those tests on
17  me.
18     Q  So you've only seen Dr. Hackman one
19  time?
20     A  Well, I probably -- I think I've
21  seen him a couple times, three times during
22  all that.
23     Q  And then how many times have you

Page 64

1  seen Dr. Hartzog since this?
2     A  I've seen him several times.
3     Q  Do you know how many times?
4     A  Oh, I don't recall.
5     Q  Is Dr. Hartzog who gave you the
6  injections in your shoulder?
7     A  Yes.
8     Q  Have you had to undergo any
9  physical therapy?
10     A  Yes.
11     Q  Where did you undergo that therapy?
12     A  In Greenville.
13     Q  What facility?
14     A  It's a hospital.
15     Q  What hospital?
16     A  Greenville Hospital.
17     Q  Greenville Hospital.  How long did
18  you have physical therapy?
19     A  Six weeks, I believe.
20     Q  And when was that?
21     A  That was -- that was last -- last
22  year.
23     Q  2007?

Page 65

1    A   Yes.  Dr. Hartzog is the one that
2  ordered that.
3    Q   Do you recall when in 2007?
4    A   That was during -- I know I was
5  going in March.  Maybe I started in
6  February.
7    Q   Did the physical therapy help?
8    A   No.
9    Q   Have you received any treatment for
10  your mouth since this incident?
11    A   No.
12    Q   So the only treatment you received
13  for your mouth was at the emergency room?
14    A   Yes.
15    Q   And you don't know what they told
16  you, if anything, was wrong with your
17  mouth?
18    A   No.  I don't remember.
19    Q   Okay.  Was it just pain that you
20  felt in your mouth?
21    A   Yes.  It hurt, still hurts.
22    Q   Did you lose any teeth?
23    A   No.

Page 66

1    Q   There was no blood or anything like
2  that?
3    A   No.
4    Q   Did you sustain any damage to your
5  jaw, that you're aware of?
6    A   I don't know.
7    Q   No doctor has indicated there was
8  any damage or injury to your mouth; is that
9  correct?
10    A   No, he hasn't.
11    Q   And you haven't required any sort
12  of treatment since then for your mouth?
13    A   No.
14    Q   Had you ever suffered any injuries
15  or required any treatment for your mouth
16  before this incident?
17    A   No, no.
18    Q   Do you have a dentist?
19    A   Yes.
20    Q   What's your dentist's name?
21    A   Dr. Crosby, Greenville.
22    Q   Did you follow up with Dr. Crosby
23  at all regarding your mouth following this

Page 67

1  incident?
2    A   No, no.
3    Q   You said you still have pain in
4  your mouth?
5    A   Yes, I do.
6    Q   Describe that for me.
7    A   It just hurts.
8    Q   How does it hurt?
9    A   Pains.
10    Q   What side?  Your right side?
11    A   Yeah, where it hit me.
12    Q   Did you have any bruising on your
13  face?
14    A   It was blue right there
15  (indicating).
16    Q   On your chain?
17    A   My back was black.
18    Q   As best you understand it, you
19  suffered some bruising on your face?
20    A   Yes.
21    Q   And that was all?
22    A   Uh-huh.
23    Q   And you haven't required any

Page 68

1  follow-up treatment?
2    A   No.
3    Q   And you've never been treated for
4  any condition of your mouth or injuries to
5  your mouth before that incident?
6    A   No.
7    Q   And that's "No?"
8    A   No.
9    Q   Okay.  Had you ever suffered any
10  injury to your right shoulder before
11  November 11th, of 2006?
12    A   No.
13    Q   What about your left shoulder?
14    A   No.
15    Q   Never injured either shoulder?
16    A   No.
17    Q   Have you told me all of the doctors
18  that you have seen since this incident for
19  treatment for any injuries you're claiming
20  as a result of this?  Have you told me all
21  of their names?
22    A   The doctors?
23    Q   Yes.

Page 69

1    A   Yes.
2    Q   So that's going to include
3  Middleton?
4    A   Dr. Middleton, Dr. Hackman, and
5  Dr. Miller.
6    Q   Who's Dr. Miller?
7    A   He's the one that done the nerve
8  test.
9    Q   What's Dr. Miller's first name?
10   A   Caldwell.
11   Q   Caldwell Miller?
12   A   I think that's the way you
13  pronounce it.  And Dr. Hartzog.
14   Q   What's Dr. Hartzog's first name?
15   A   I believe Charles.
16   Q   Charles?
17   A   I believe.
18   Q   You only saw Dr. Miller one time?
19   A   For the nerve test.
20   Q   And you were treated at Baptist
21  South in the Jackson Hospital?
22   A   Yes.  I was treated at Baptist
23  South when this happened.

Page 70

1    Q   Okay.  Are one of those doctors
2  located at Jackson Hospital?  Is that
3  where --
4    A   Dr. Hackman.
5    Q   Have you been treated at Baptist
6  South at any time since this incident?
7    A   No.
8    Q   Have you been injured in any manner
9  since November 11th, 2006?
10   A   No, no.
11   Q   Have you suffered any sort of
12  injuries to your shoulders since this
13  happened?
14   A   No.
15   Q   Have you ever been involved in a
16  motor vehicle accident?
17   A   No.
18   Q   Were you a patient of
19  Dr. Middleton's prior to November 11th,
20  2006?
21   A   Repeat that.
22   Q   Sure.  Were you a patient of
23  Dr. Middleton's prior to November 11th,

Page 71

1  2006?
2    A   Yes.
3    Q   How long had you been a patient of
4  hers?
5    A   Several years.
6    Q   Were there any other doctors that
7  you would see on a regular basis?  I know
8  you mentioned that you had previously been
9  treated by Dr. Hackman for your back?
10   A   Yeah.
11   Q   Were there any other doctors --
12   A   No.
13   Q   -- that you saw other than
14  Dr. Middleton?
15   A   No.
16   Q   Have any doctors indicated to you
17  that this is a permanent injury?
18   A   The only thing that Dr. Hartzog
19  said the lick that I got that tore roller
20  cup that I would have to have surgery if
21  that straightened it out.  But as far as
22  the damaged nerves, they're not for sure
23  about that.

Page 72

1       Dr. Middleton has mentioned to the
2  fact that since the nerves is damaged, that
3  she felt like that I would have to continue
4  with that.
5    Q   What are the symptoms that you have
6  as a result of the damaged nerves that
7  you're testifying to?
8    A   My arm goes to sleep and my hand
9  tingles, my fingers.  And it -- my arms
10  sometimes -- like if I pick up something
11  and I get it right here (demonstrating), it
12  wants to give way.
13   Q   Had you ever experienced any
14  tingling in your arms or your arm, your
15  right arm going to sleep, prior to November
16  11th, of 2006?
17   A   No.
18   Q   Has this injury limited any of your
19  daily activities?
20   A   Yes.
21   Q   And how is that?
22   A   I can't use this arm.
23   Q   Your right arm?

Page 73

1    A   Yes.  To do anything hardly.
2    Q   Have --
3    A   Even when I'm eating, you know,
4  like I said, when I pick up something,
5  sometimes it will give away.
6    Q   Now, are you right-handed or
7  left-handed?
8    A   I'm right-handed.  And it affects
9  my -- when I'm trying to write, too.
10    Q   Are you able to write?
11    A   I can write but, you know, it takes
12  me a little while sometimes to get it
13  wrote.
14    Q   Is there anything that you can't do
15  now that you could do before this incident?
16    A   I can't mop, I can't sweep, and,
17  you know, like changing a bed, I can't do
18  that.  Most other things that's -- you
19  know, that's -- that I could do with my
20  right hand before, I can't.
21    Q   Do you have someone that helps you
22  with those tasks?
23    A   Yes.

Page 74

1    Q   And who is that?
2    A   I get a lady to come in that helps
3  me some.
4    Q   That helps you with cleaning your
5  house?
6    A   Yes.
7    Q   What's her name?
8    A   Patty.
9    Q   Patty?
10    A   Uh-huh.
11    Q   Has she been helping you with your
12  house --
13    A   Some, not very much.
14    Q   How long has she been helping you
15  with your housecleaning?
16    A   Since this.
17    Q   Since November?
18    A   Yes.
19    Q   Of 2006?
20    A   Uh-huh.
21    Q   Did you have anyone helping you
22  with your housecleaning prior to that time?
23    A   No.

Page 75

1    Q   Now, prior to November 11th of
2  2006, had you ever experienced any pain in
3  your shoulder?
4    A   No.
5    Q   And you've never received any
6  medical treatment for your shoulder?
7    A   No.
8    Q   Were you on any pain medicines
9  prior to November 11th of 2006?
10    A   No.  Wasn't taking nothing.
11    Q   Was the only physical therapy you
12  had undergone in relation to your back
13  injury?
14    A   Yes.
15    Q   Have you ever been treated by a
16  chiropractor?
17    A   No.
18    Q   Have you been released from any of
19  these doctors' care?
20    A   No.
21    Q   You just don't have any follow-up
22  appointments scheduled?
23    A   Right, right.

Page 76

1    Q   Do you know the total amount of
2  medical bills that you're claiming as a
3  result of this incident?
4    A   I do not know.
5        MR. HARRISON:  Like I said,
6  Ashley, we'll update you on that.
7        MRS. MANNING:  Okay.
8    Q   (By Mrs. Manning) Have you incurred
9  any out-of-pocket expenses?  Have you
10  personally had to pay anything out of
11  pocket in relation to any medical expenses
12  that you're claiming in this lawsuit?
13    A   Co-payments.
14    Q   Okay.  And what is your co-pay
15  amount?
16    A   It's from $3 to $5.
17    Q   $3 to $5?
18    A   Uh-huh.
19    Q   Is that every time you go to the
20  doctor?
21    A   Yes.
22    Q   So do you know how many times
23  you've gone to the doctor?

Page 77

1    A   I don't recall.  Several.
2    Q   So do you have an estimate of the
3  amount of co-pays --
4    A   I do not.
5       MRS. MANNING:  Okay.  If we can
6  get that as well?
7       MR. HARRISON:  I will get that
8  to you.
9    Q   (By Mrs. Manning) Do you have
10  health insurance?
11    A   I have Medicare.
12    Q   Medicare?
13    A   And Medicaid.
14    Q   And Medicaid?
15    A   Yes.
16    Q   And did you have that at that time
17  of this incident --
18    A   Yes.
19    Q   -- November 11th of 2006?  Okay.
20  Have either Medicare or Medicaid written
21  you any letters that are indicating they
22  expect to be reimbursed?
23    A   No.

Page 78

1    Q   You haven't received anything like
2  that?
3    A   No.
4    Q   Have you incurred any pharmacy
5  bills?
6    A   No.
7    Q   You testified you were on
8  hydrocodone?
9    A   What -- repeat that question.
10    Q   Pharmacy expenses for medication?
11    A   Oh, I have that.
12    Q   Okay.  Is that covered under your
13  Medicare or Medicaid?
14    A   Yes.
15    Q   Okay.  Have you had to pay any
16  out-of-pocket expenses?
17    A   Yes, I have.  The co-pay ones.
18    Q   Just the co-pay for your
19  prescriptions?
20    A   Well, now, some -- unless there's
21  something that -- you know, that they don't
22  cover.
23    Q   What is your prescription co-pay?

Page 79

1    A   It's either from -- it -- you know,
2  it's different.  You know, times it's $2
3  sometimes it's $3, sometimes it might be
4  five.  It depends.
5    Q   And if you could get that
6  information to your attorney as well, that
7  would be great.
8       And you testified you have not been
9  back to this Fred's store since November
10  11th?
11    A   Correct.
12    Q   And you haven't talked to any of
13  the store employees since that time?
14    A   I tried to get in touch with the
15  main manager.  I made several calls to him
16    Q   Who is the main manager that you're
17  referring to?
18    A   I can't recall his name.
19    Q   Is that the manager that you
20  testified that you spoke with the next day?
21    A   No.  The one I spoke to was at
22  Fred's.  There where the picture frame fell
23  on me.

Page 80

1    Q   You spoke to the store manager --
2    A   Store manager.
3    Q   Well, who was the other person you
4  were trying to get in touch with?
5    A   They told me that the main manager
6  of Fred's, which I called two or three
7  times, and every time I'd call, the lady
8  would say he wasn't there.  And I left my
9  name and number for him to call me back,
10  and he never did respond to my calls.
11    Q   Do you have the name of that main
12  manager you're referring to?
13    A   I probably do at home, not with me.
14       MR. HARRISON:  We'll get that to
15  you, too.
16       MRS. MANNING:  Okay.
17    A   But I never did -- like I said, I
18  didn't get -- he wouldn't call me back.
19    Q   How many times are you --
20    A   I called three times.
21    Q   Three times.  Was it within a day
22  or two of this incident?
23    A   Yes.

Page 81

1    Q   Who was the lady that you spoke
2  with? Do you know her name?
3    A   No.
4    Q   Just someone in his office?
5    A   Uh-huh.
6    Q   What is it that you're claiming
7  that Fred's did wrong that day?
8        MR. HARRISON: Objection. You
9  can answer.
10   A   I don't believe they had their --
11 in the first place, I believe they should
12 have been paying more attention to their
13 stuff of being higher than anybody's head.
14 I think that that's one rule that they
15 should obligate theirselves to is to make
16 sure that none of the customers do not get
17 hurt. And, like I said, if they had been
18 paying close attention, that picture frame
19 would have never fell on me.
20   Q   Now, you testified earlier that you
21 don't have any evidence that any of the
22 store employees that day had any knowledge
23 that this picture frame could fall?

Page 82

1    A   They didn't tell me nothing.
2    Q   You don't have any evidence to
3  support that they had no -- any sort of
4  dangerous condition involving this picture
5  frame?
6        MR. HARRISON: Objection.
7    A   No.
8    Q   Okay. And you mentioned that they
9  should have paid more attention to stuff
10 being higher than a person's head?
11   A   Right.
12   Q   Okay. What do you mean by that?
13   A   I think they should notice their
14 stuff to make sure that picture frames is
15 secure up there on that wall.
16   Q   Do you have any evidence to
17 indicate that they were not making sure
18 that things were secure on the wall?
19       MR. HARRISON: Objection.
20   A   I can't say that.
21   Q   Okay. But you would agree that no
22 one in the store gave you any indication
23 that they were aware that this picture

Page 83

1  frame could fall or was going to fall and
2  just didn't do anything about it?
3        MR. HARRISON: Objection.
4    A   Nobody said nothing to me.
5    Q   Okay. And it was just one picture
6  frame; correct?
7    A   Yes.
8    Q   So the other -- you're not stating
9  that all of the merchandise was not secure?
10       MR. HARRISON: Objection.
11   A   I can't answer that.
12   Q   Okay. Do you maintain that any
13 specific employee of Fred's did anything
14 wrong that day?
15       MR. HARRISON: Objection.
16   A   I can't answer that.
17   Q   Well, why can't you answer that?
18       MR. HARRISON: Objection.
19   A   Because I don't know if they did or
20 not.
21   Q   Okay. Well, are you maintaining
22 that somebody did something wrong? A
23 specific employee of the store that you

Page 84

1  dealt with?
2        MR. HARRISON: Objection.
3    A   I didn't say that.
4    Q   Well, I understand that you didn't
5  say that, but I'm asking you if you're
6  maintaining that some specific employee
7  that you dealt with or otherwise did
8  anything wrong that day?
9        MR. HARRISON: Objection.
10   A   No.
11   Q   Okay. I'm going to just go ahead
12 and mark this as Defendant's Exhibit 1, and
13 then if I could mark this.
14       Ms. Spivey, I'm going to ask you to
15 take a look at this document that we've
16 marked as Defendant's Exhibit 2. Do you
17 recognize that document?
18       (Defendant's Exhibit Nos. 1 & 2
19       was marked for identification.)
20   A   What do you mean do I recognize it?
21   Q   Have you seen that document before?
22   A   Nope.
23   Q   Okay. Well, turn to the third

Page 85

1  page. Is that your signature at the top of
2  the third page?
3  A  Yes, it is.
4  Q  Did you understand when you signed
5  these that these were your responses to the
6  interrogatories that we had forwarded to
7  you --
8  A  Yes.
9  Q  -- and your attorney? Did you
10 assist in providing responses to these
11 questions?
12 A  Yes.
13 Q  Okay. I just want to ask you a few
14 questions about these responses to make
15 sure I've got the information that I need.
16 On No. 6 here, I believe the question was
17 asking you about the medical providers that
18 you have been treated by since November
19 11th of 2006, and does that indicate all of
20 the medical providers that you have seen?
21 A  Yes.
22 Q  So there aren't any others, that
23 you can recall?

Page 86

1  A  No.
2  Q  And then on the next page under
3  item No. 8, I believe the question was in
4  regard to prescriptions and you indicate
5  CVS Narrow Lane and CVS Greenville?
6  A  Correct.
7  Q  And those are the two pharmacies
8  where you got your prescriptions filled?
9  A  Yes.
10 Q  Are there any other pharmacies?
11 A  No.
12 Q  Okay. Item No. 14, I believe was
13 asking about individuals with any knowledge
14 about this incident and you stated another
15 customer and defendant's cashier. And
16 those are the folks you've told me about
17 today?
18 A  Yes.
19 Q  There aren't any other customers
20 that you talked to that day?
21 A  No.
22 Q  Or other than the cashier or other
23 employees?

Page 87

1  A  No.
2  Q  Okay.
3      MRS. MANNING: Let me just run
4  through my notes, and I may be just about
5  finished.
6      MR. HARRISON: Sure, I
7  understand.
8      (Short recess.)
9  Q  (By Mrs. Manning) Okay. I just
10 have a few more question, and I think we'll
11 be finished.
12     When you were in the area where this
13 happened with your buggy and you were
14 looking at the sweaters and then the blue
15 jeans, I just want to make sure I'm clear
16 with it. Was it your testimony that you
17 had not looked at the wall or the shelves
18 where these picture frames were?
19 A  I knew where the wall was, and I
20 knew I was back from the wall.
21 Q  Did you know that there was
22 merchandise on the wall?
23 A  I don't recall.

Page 88

1  Q  Okay. You just knew there was a
2  wall there?
3  A  Uh-huh. I didn't look up.
4  Q  And then after this happened, you
5  looked at the floor and saw the glass on
6  the floor, and at that point, you looked up
7  and noticed other frames on the shelf?
8  A  Yes.
9  Q  Did the other frames appear to be
10 in their proper place, so to speak?
11     MR. HARRISON: Objection.
12 A  I don't know.
13 Q  Did they appear to be secured on
14 the shelf?
15     MR. HARRISON: Objection.
16 A  I don't know.
17 Q  Were any of them dangled or
18 anything like that?
19 A  I can't answer that.
20 Q  You don't know one way or the
21 other?
22 A  (Witness shakes head.)
23 Q  And that's a "no?"

Page 89

1      MR. HARRISON: Objection.
2    A   Right.
3    Q   Did you do anything to prepare for
4  your deposition today other than meet with
5  your attorney -- and I don't want to get
6  into that, but did you review any documents
7  or talk to anybody else other than your
8  attorney?
9    A   No.
10   Q   Have you talked with anybody else
11 about this incident?
12   A   No.
13   Q   So the only people that you've
14 talked to about this incident are the folks
15 that you've testified about at the store
16 that day and then your doctors?
17   A   Right.
18   Q   Anybody else?
19   A   My attorney.
20   Q   Okay.  And have you obtained any
21 statements from anybody?
22   A   No.
23   Q   Okay.  When did you first contact

Page 90

1  an attorney?
2    A   I believe that was in February.
3    Q   February of 2007?
4    A   I believe.
5    Q   What prompted you to contact an
6  attorney?
7    A   I felt like that I needed one
8  because I had got hurt.
9    Q   Did you talk to any other attorneys
10 other than Brett?
11   A   No.
12   Q   Was he the first attorney that you
13 went to?
14   A   Yes.
15   Q   Now, what damages are you claiming
16 in this lawsuit?  How have you been
17 damaged, in your own words?
18   A   My shoulder and my arm, my mouth.
19   Q   And when you say your arm, are you
20 referring to the nerve issue?
21   A   From my shoulder right there
22 (indicating), down my arm into my fingers.
23   Q   And that's the numbness that you

Page 91

1  experience, or the tingling?
2    A   Yes.  It hurts, too.  It hurts from
3  right here down (indicating) and then my
4  arm will go to sleep and my hands will go
5  to sleep tingling.
6    Q   How often do you experience that?
7    A   When I try to do something or
8  either when I'm sitting around -- you may
9  have noticed me moving, but my hands will
10 go to sleep.  I can be sitting at home at
11 night watching TV and my hands will go to
12 sleep.  That's the reason I can't drive
13 much.
14   Q   How often does that happen?
15   A   Every day.
16   Q   So you experience pain every day?
17   A   Every day, every day.  I have to
18 take pain pills every four hours and would
19 take them less than that if I could.
20   Q   And you are able to drive, though?
21   A   Not very much.
22   Q   When you say "Not very much --"
23   A   I don't hardly ever drive.  I

Page 92

1  usually -- somebody carries me.  My sister
2  usually takes me.
3    Q   Do you drive daily?
4    A   No.
5    Q   Did you drive here today?
6    A   No.
7    Q   Did your sister bring you today?
8    A   Yes.
9    Q   Are you making a claim for mental
10 anguish or emotional distress --
11     MR. HARRISON: Objection.
12   Q   -- in this lawsuit?
13     MR. HARRISON: I don't know that
14 she understands those kinds of terms at
15 all.
16   Q   Are you claiming that you have
17 suffered any sort of mental anguish as a
18 result of this incident?
19   A   I would say so in some sort of way.
20   Q   And describe that for me.
21   A   Because when you have pain as bad
22 as I've had it, that will affect your
23 mental, because pain is terrible.

Page 93

1    Q   And have you been required to seek
2  any sort of medical treatment from a
3  psychiatrist?
4    A   No.
5    Q   Or psychologist?
6    A   No.  It's not that bad.
7    Q   Have you ever been under the care
8  of a psychiatrist?
9    A   No.
10   Q   Or a psychologist?
11   A   No.
12   Q   Have you had to undergo any type of
13  counseling since this incident?
14   A   No.
15   Q   Have you ever had to undergo any
16  counseling?
17   A   No.
18   Q   Are you a member of a church in --
19   A   Church of Christ.
20   Q   Church of Christ.  What's the name
21  of the church?
22   A   Sardis.
23   Q   Sardis?  How do you spell that?

Page 94

1    A   S-A-R-D-I-S.
2    Q   How long have you been a member
3  there?
4    A   All my life.
5    Q   Where is that?
6    A   Down 331.
7    Q   331, in what town?
8    A   In Sardis.
9    Q   In Sardis, okay.  Is that near your
10  home?
11   A   Uh-huh.
12   Q   Do you know how much this picture
13  frame weighed?
14       MR. HARRISON:  Objection.
15   A   It felt like it weighed 40 pounds
16  or more.  That was the worst lick I ever
17  had in my life.
18   Q   When you say that was the worst
19  lick in your life, had you been hurt before
20  by some object?
21   A   No, no, no.
22   Q   Now, in your complaint, you claim
23  that you suffered emotional distress.  And

Page 95

1  I'd like for you in your own words to
2  describe what you mean by that.
3    A   You explain your question, and then
4  I will.
5    Q   That's probably fair.  Your
6  complaint, which I probably -- I don't know
7  if you participated in drafting it.  It may
8  have been drafted by your attorney.  But
9  you indicate in there that you suffered
10  emotional distress as a result of this
11  incident at Fred's.  And I just want to see
12  if you can explain to me what you mean by
13  that or how you've experienced emotional
14  distress.  Is that what you were referring
15  to earlier?
16       MR. HARRISON:  Objection.
17   A   Yes.
18   Q   Okay.  By the pain that you
19  suffered?
20   A   Yes, yes.  Nobody don't know what
21  I've been through.
22   Q   But you haven't had to talk to
23  anyone?

Page 96

1    A   No.
2    Q   Any professional about any issues
3  related to this?
4    A   No.
5    Q   Is there any reason you don't have
6  an appointment scheduled with Dr. Hartzog
7  currently?
8    A   I don't know that.
9    Q   Did he ask you to schedule a
10  follow-up appointment?
11   A   He said that he couldn't give me
12  them shots, that many, and he said until he
13  got ready to do the surgery on me, that he
14  wasn't going to have me coming every week
15  or two weeks to get them shots.  The shots
16  only last a couple of days, and they can't
17  give you that many shots.  Them shots that
18  he was giving me.
19   Q   And that was in November of 2007?
20   A   Yes.  Maybe -- I may have seen him
21  since.  I've seen him since then because I
22  made several trips to him after then.
23   Q   Well, I mean, I say November.  I

Page 97

1  mean the fall of 2007.  So just a couple
2  months ago -- a few months ago?
3      A   Yes.
4      Q   Was that the last time you saw him?
5      A   Yes.
6      Q   Did he recommend that you schedule
7  this surgery at that time?
8      A   He said that we would talk about it
9  later about the surgery.
10     Q   He said you'll talk about it later?
11     A   Yes.
12     Q   But you don't -- he didn't --
13     A   We haven't set a date for the
14  surgery.
15     Q   And he did not recommend that you
16  come back or follow up with him at all?
17     A   He said if I needed to come back
18  that he would give me the shots.
19     Q   Now, I thought you just said he
20  told you he couldn't give you any more
21  shots?
22     A   Well, I haven't had any, see, since
23  a while.  He could now.  That's why he put

Page 98

1  me on the pain pills.
2      Q   And you don't have any follow-up
3  appointments scheduled?
4      A   Not right now.
5          MRS. MANNING:  I think that's
6  all I have.  Thank you.
7          (Defendant's Exhibit No. 3 was
8          marked for identification.)
9          (The deposition of LINDA SPIVEY
10         was concluded at 11:43 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 99

1              CERTIFICATE
2  STATE OF ALABAMA )
3                  ) ss:
3  COUNTY OF SHELBY )
4    I hereby certify that the above and
5  foregoing deposition was taken down by me
6  in stenotype, and the questions and answers
7  thereto were transcribed by means of
8  computer-aided transcription, and that the
9  foregoing represents a true and correct
10 transcript of the testimony given by said
11 witness upon said hearing.
12       I further certify that I am
13 neither of counsel, nor of kin to the
14 parties to the action, nor am I in anywise
15 interested in the result of said cause.
16   IN WITNESS WHEREOF, I have hereunto se
17 my hand and affixed my seal March 23, 2008.
18
19
                  Anna Tolleson
20                Commissioner and Notary
                  Public
21                State at Large
22
   My Commission Expires:  January 11, 2010.
23

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 JUN 27  A II: 01

LINDA SPIVEY,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CASE NUMBER: 2:07-cv-594-WHA
                                       )
FRED'S, INC.,                          )
                                       )
        Defendant.                     )

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

---

## NOTICE OF REMOVAL

---

COMES NOW the Defendant, Fred's Stores of Tennessee, Inc. incorrectly identified in Plaintiff's Complaint as Fred's Inc. (hereinafter referred to as "Fred's"), and files this Notice of Removal of this case from the Circuit Court of Montgomery County, Alabama to the United States District Court for the Middle District of Alabama, Northern Division. This Notice of Removal is filed pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. In support of said removal, Fred's shows unto the Court as follows:

1.      On May 22, 2007, the Plaintiff, Linda Spivey, filed a Complaint in the Circuit Court of Montgomery County, Alabama, and bearing Civil Action Number CV-07-900329. (A copy of the Complaint is attached hereto as Exhibit A).

2.      The Complaint sets forth claims for negligence and negligent infliction of emotional distress against Fred's. (Exhibit A). The Plaintiff seeks damages for bodily damage and pain and suffering. The Plaintiff seeks compensatory and punitive damages against Fred's. Additionally, the Plaintiff seeks an "award of costs, attorney's fees and expenses as may be permitted by law or equity." (Exhibit A).

**EXHIBIT**

C

Respectfully submitted,

Daniel S. Wolter (WOL012)
Ashley E. Manning (MAN048)
Attorneys for Defendant Fred's Stores of
Tennessee

**OF COUNSEL:**

**Gaines, Wolter & Kinney, P.C.**
3500 Blue Lake Drive
Suite 425
Birmingham, AL 35243
Phone: (205) 980-5888
Fax:    (205) 980-1098

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon counsel for all parties by placing a copy of same in the United States Mail, properly addressed and postage prepaid, this the _26_ day of June , 2007, to:

Jackson B. Harrison, Esquire
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, Alabama 36117

OF COUNSEL

# EXHIBIT A

| State of Alabama<br>Unified Judicial System<br><br>Form C-34  Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br>03-CV-2007-900329.00 |
|---|---|---|

**IN THE CIVIL COURT OF MONTGOMERY, ALABAMA**
**LINDA SPIVEY v. FRED'S, INC.**

NOTICE TO  FRED'S, INC., 4300 NEW GETWELL RD., MEMPHIS TN, 38118

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JACKSON HARRISON

WHOSE ADDRESS IS 8425 CROSSLAND LOOP, MONTGOMERY AL, 36117

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of    LINDA SPIVEY
  pursuant to the Alabama Rules of the Civil Procedure

5/22/2007 1:59:29 PM                    /s MELISSA RITTENOUR
Date                                    Clerk/Register                          By

☑ Certified mail is hereby requested      /s JACKSON HARRISON
                                          Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____


_____               _____
Date                                   Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93  Rev.5/99 | **COVER SHEET<br>CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>**03-CV-200**<br>Date of Filing:<br>05/22/2007 |  |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT OF MONTGOMERY COUNTY, ALABAMA
### LINDA SPIVEY v. FRED'S, INC.

**First Plaintiff:** ☐ Business  ☑ Individual  ☐ Government  ☐ Other

**First Defendant:** ☑ Business  ☐ Individual  ☐ Government  ☐ Other

## NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

- ☐ WDEA - Wrongful Death
- ☑ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**

- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS  (cont'd)**

- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture<br>Appeal/Enforcement of Agency Subpoena/Petition to<br>Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP-Contempt of Court
- ☐ CONT-Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND- Equity Non-Damages Actions/Declaratory<br>Judgment/Injunction Election Contest/Quiet Title/Sale For<br>Division
- ☐ CVUD-Eviction Appeal/Unlawfyul Detainer
- ☐ FORJ-Foreign Judgment
- ☐ FORF-Fruits of Crime Forfeiture
- ☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB-Protection From Abuse
- ☐ FELA-Railroad/Seaman (FELA)
- ☐ RPRO-Real Property
- ☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP-Workers' Compensation
- ☐ CVXX-Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING    A ☐ APPEAL FROM<br>DISTRICT COURT    O ☐ OTHER

R ☐ REMANDED    T ☐ TRANSFERRED FROM<br>OTHER CIRCUIT COURT  _____

**HAS JURY TRIAL BEEN DEMANDED?**    ☑ Yes  ☐ No

**RELIEF REQUESTED:**    ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**  HAR285    5/22/2007 1:58:36 PM    /s JACKSON HARRISON

**MEDIATION REQUESTED:**    ☐ Yes  ☑ No  ☐ Undecided

**IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA**

| | | |
|---|---|---|
| LINDA SPIVEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV-2007_____ |
| | ) | |
| FRED'S, INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

<u>COMPLAINT</u>

**I. PARTIES**

COMES NOW Plaintiff, LINDA SPIVEY, by and through counsel and respectfully pleads and alleges as follows:

1.    Plaintiff, LINDA SPIVEY, is an individual who is over the age of nineteen and resides in Crenshaw County, Alabama.

2.    Defendant, FRED'S, INC., is a corporation whose Articles of Incorporation are filed in the State of Tennessee and whose address is 4300 NEW GETWELL RD., Memphis, TN 38118.

**II. JURISDICTION AND VENUE**

3.    This Court has jurisdiction over this action pursuant to Ala. Code § 12-11-30(1).

4.    This Court has venue over this action pursuant to Ala. Code § 6-3-7(a)(1).

### III. FACTUAL ALEGATIONS

7.   On or about November 11, 2006, Plaintiff was a customer in the Eastern Boulevard location of the Defendant.

8.   The Defendant negligently displayed a large, heavy picture along the walkway of its customers.

9.   While in the Defendant's store, the large picture fell from the wall and injured the Plaintiff.

10.   The Plaintiff has suffered bodily damage and pain and suffering as a direct result of the previously stated incident.

### IV. CAUSES OF ACTION

**COUNT ONE- NEGLIGENCE**

11.   Plaintiff realleges all allegations and averments contained in paragraphs (1) through (10) as if fully set out herein.

12.   The Defendant owed the Plaintiff a duty of care to not place the Plaintiff in danger of damage or loss by securing and ensuring that the walkway inside the store of the Defendant was free from falling objects.

13.   The Defendant breached that duty of care to the Plaintiff by failing to secure the walkway inside the store of the Defendant and allowing a large, heavy picture to fall from the rafters injuring the Plaintiff.

14. The Defendant's breach of its duty of care to the Plaintiff caused the Plaintiff to be damaged physically and emotionally.

WHEREFORE, the Plaintiff, LINDA SPIVEY, demands judgment against the Defendant, FRED'S, INC.., any and all compensatory damages she has suffered as a result of the Defendant's negligence. Additionally, the Plaintiff demands judgment for punitive damages against the Defendant, FRED'S, INC..

**COUNT TWO- NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

15. Plaintiff realleges all allegations and averments contained in paragraphs (1) through (10) as if fully set out herein.

16. The Defendant owed the Plaintiff a duty of care to negligently cause the Plaintiff emotional distress.

17. The Defendant breached that duty of care to the Plaintiff by failing to secure the walkway inside the store of the Defendant and allowing a large, heavy picture to fall from the rafters injuring the Plaintiff.

18. The Defendant's breach of its duty of care to the Plaintiff caused the Plaintiff to suffer severe emotional distress.

WHEREFORE, the Plaintiff, LINDA SPIVEY, demands judgment against the Defendant, FRED'S, INC.., any and all

compensatory damages she has suffered as a result of the Defendant's negligent infliction of emotional distress. Additionally, the Plaintiff demands judgment for punitive damages against the Defendant, FRED'S, INC..

### V.    PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff, LINDA SPIVEY, respectfully prays that this Court:

(a) Assume jurisdiction over this action;

(b) Empanel a jury to decide such triable issues as may exist in this case;

(c) Grant to Plaintiff such relief to which it is entitled;

(d) Make such award of costs, attorney's fees and expenses as may be permitted by law or equity.


Respectfully submitted this 22nd day of MAY, 2007.


/S/ JACKSON B. HARRISON
Jackson B. Harrison (HAR 285)
Attorney for Plaintiff


OF COUNSEL:
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, AL 36117
(334) 819-8920
(334) 819-8923 (fax)

# EXHIBIT B

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| LINDA SPIVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-07-900329 |
| | ) | |
| FRED'S, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF BRADLEY D. McADORY

STATE OF TENNESSEE    )

SHELBY COUNTY          )

Before me, the undersigned authority, a Notary Public in and for said State and County, personally appeared, who being by me first duly sworn, doth depose and say as follows, to wit:

1.      My name is Bradley D. McAdory.  I am over the age of nineteen and a resident of Shelby County, Tennessee.  I have personal knowledge of the matters set forth in this Affidavit.

2.      I am the Assistant General Counsel for Fred's Stores of Tennessee, Inc.

3.      Fred's Stores of Tennessee, Inc. is a corporation organized and existing under the laws of the State of Tennessee and which at all times relevant to the Complaint, was authorized to conduct business in Alabama.

Further Affiant saith not.

Bradley D. McAdory

STATE OF TENNESSEE
COUNTY OF SHELBY

Sworn to and subscribed before me this 20th day of _____June_____, 2007.

Notary Public

My commission expires: _February 26, 2008_

2

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LINDA SPIVEY,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )     CASE NUMBER:
                                       )     2:07-CV-594-WHA
FRED'S, INC.,                          )
                                       )
        Defendant.                     )

---

## ANSWER

---

Comes Now the Defendant, Fred's Stores of Tennessee, Inc., incorrectly identified in Plaintiff's Complaint as "Fred's, Inc." (hereinafter "Fred's") and for Answer to Plaintiff's Complaint, and to each count and paragraph thereof, separately and severally, set down and assign the following separate and several defenses and state as follows:

### I.      PARTIES

1.      Fred's is without sufficient information to admit or deny the allegations set forth in Paragraph 1 of Plaintiff's Complaint and therefore denies the same.

2.      Fred's denies the allegations as set forth in Paragraph 2 of Plaintiff's Complaint.

### II.     JURISDICTION AND VENUE

3.      Fred's denies the allegations set forth in Paragraph 3 of Plaintiff's Complaint and demands strict proof thereof.

4.      Fred's denies the allegations set forth in Paragraph 4 of Plaintiff's Complaint and demands strict proof thereof.



### III.    FACTUAL ALLEGATIONS

7.    Fred's is without sufficient information to admit or deny the allegations set forth in Paragraph 7 of Plaintiff's Complaint and therefore denies the same.

8.    Fred's denies the allegations set forth in Paragraph 8 of Plaintiff's Complaint and demands strict proof thereof.

9.    Fred's denies the allegations set forth in Paragraph 9 of Plaintiff's Complaint and demands strict proof thereof.

10.    Fred's denies the allegations set forth in Paragraph 10 of Plaintiff's Complaint, contests damages, and demands strict proof thereof.

### IV.    CAUSES OF ACTION

### COUNT ONE – NEGLIGENCE

11.    Fred's readopts and realleges all previous responses to prior paragraphs of Plaintiff's Complaint as if fully set forth herein.

12.    Fred's denies the allegations set forth in Count One, Paragraph 12 of Plaintiff's Complaint and demands strict proof thereof.

13.    Fred's denies the allegations set forth in Count One, Paragraph 13 of Plaintiff's Complaint and demands strict proof thereof.

14.    Fred's denies the allegations set forth in Count One, Paragraph 14 of Plaintiff's Complaint, contests damages, and demands strict proof thereof.

### COUNT TWO – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

15.    Fred's readopts and realleges all previous responses to prior paragraphs of Plaintiff's Complaint as if fully set forth herein.

16.     Fred's denies the allegations set forth in Count Two, Paragraph 16 of Plaintiff's Complaint and demands strict proof thereof.

17.     Fred's denies the allegations set forth in Count Two, Paragraph 17 of Plaintiff's Complaint and demands strict proof thereof.

18.     Fred's denies the allegations set forth in Count Two, Paragraph 18 of Plaintiff's Complaint, contests damages, and demands strict proof thereof.

**V.     PRAYER FOR RELIEF**

19.     Fred's readopts and realleges all previous responses to prior paragraphs of Plaintiff's Complaint as if fully set forth herein.

20.     Fred's denies the allegations set forth in Plaintiff's Prayer for Relief, contests damages, and demands strict proof thereof.

**FIRST DEFENSE**

This defendant pleads not guilty.

**SECOND DEFENSE**

This defendant denies each and every material allegation of the complaint and demands strict proof thereof.

**THIRD DEFENSE**

This defendant denies that it acted wantonly or negligently on the occasion described in the plaintiff's complaint.

**FOURTH DEFENSE**

This defendant pleads the affirmative defense of contributory negligence.

**FIFTH DEFENSE**

This defendant asserts that the area in question was open and obvious.

3

## SIXTH DEFENSE

This defendant denies that the plaintiff is injured to the extent as alleged in the complaint and demands strict proof thereof.

## SEVENTH DEFENSE

This defendant states this matter is due to be dismissed as the complaint was filed outside of the applicable statute of limitations.

## EIGHTH DEFENSE

Defendant asserts Ala. Code §12-21-45 (1975), pursuant to Dixie Marsh v. Rodgers Green, M.D., 782 So.2d 223 (Ala. 2000), as its Eighth Affirmative Defense. Plaintiff claims damages for medical expenses and/or hospital expenses which have been, or which will be reimbursed or paid, in part or in full.

## NINTH DEFENSE

This defendant denies that it had actual or constructive notice of any dangerous or defective condition on its premises as alleged in the Complaint.

## TENTH DEFENSE

This defendant asserts that it are entitled to a set-off or credit of any and all settlement amounts paid by any party or potential party to this litigation, with or not named herein, pursuant to Williams v. Colquitt, 272 Ala.577, 133 So. 2d 364 (Ala. 1961), and its progeny.

## ELEVENTH DEFENSE

With regard to punitive damages, this defendant pleads the following punitive damages defenses:

4

1.     Plaintiff's claim of punitive damages violates the Fourth, Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States, and Article I Section 6 of the Constitution of Alabama, on the following grounds:

a.     It is in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution to impose punitive damages, which are penal in nature, against civil defendants upon the plaintiff's satisfying a burden of proof which is less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b.     The procedures pursuant to which punitive damages are awarded may result in the award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing, which infringes the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution;

c.     The procedures pursuant to which punitive damages are awarded fail to provide a reasonable limit on the amount of the award against defendants, which thereby violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution;

d.     The procedures pursuant to which punitive damages are awarded fail to provide specific standards, or provides vague or insufficient standards, for the amount of the award of punitive damages which thereby violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

e.     The procedures pursuant to which punitive damages are awarded result in the imposition of different penalties for the same or similar acts and, thus, violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

f.     The procedures pursuant to which punitive damages are awarded permit the imposition of punitive damages in excess of the maximum criminal fine for the same or similar conduct, which thereby infringes the Due Process Clause of the Fifth and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

g.     The procedures pursuant to which punitive damages are awarded fail to require that an award of punitive damages be proportioned, or bear a reasonable relationship, to the actual harm incurred.

h.    The procedures pursuant to which punitive damages are awarded fail to provide mitigating factors for the jury's consideration in awarding punitive damages.

2.    Plaintiff's claim of punitive damages violates the Due Process Clause of Article I, Section 6 of the Constitution of Alabama on the following grounds:

a.    It is a violation of the Due Process Clause to impose punitive damages, which are penal in nature, upon civil defendants upon the plaintiff's satisfying a burden of proof less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b.    The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against the defendants;

c.    The procedures pursuant to which punitive damages are awarded are unconstitutionally vague;

d.    The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages; and

e.    The award of the punitive damages in this case constitutes a deprivation of property without due process of law.

3.    Plaintiff's attempt to impose punitive or extracontractual damages on these Defendants, on the basis of vicarious liability for the conduct by others, violates the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the Alabama Constitution.

4.    The award of punitive damages to the Plaintiff in this action would constitute a deprivation of property without due process of law required under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the Alabama Constitution.

5.    The award of punitive damages against the Defendants in this action would violate the prohibition against laws that impair the obligations of contracts in violation of Article I, Section 22 of the Constitution of Alabama.

6.    The procedures pursuant to which punitive damages are awarded permit the imposition of punitive damages in excess of the amount established by the legislature under Ala. Code Section 27-1-17 (1975), in violation of the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 6, of the Alabama Constitution.

## TWELFTH DEFENSE

This defendant denies it breached any duty to the plaintiff.

## THIRTEENTH DEFENSE

This defendant denies that the plaintiff is legally entitled to recover damages from this defendant.

## FOURTEENTH DEFENSE

This defendant avers that there is no causal connection or relationship between any alleged negligence on the part of the defendant and the plaintiff's injuries or damages.

## FIFTEENTH DEFENSE

Fred's pleads any other matter constituting avoidance or affirmative defense not specifically set out herein and hereby reserves the right to amend this Answer to include any such avoidance or affirmative defense as they may become known or available.

## SIXTEENTH DEFENSE

This defendant reserves the right to amend its answer as future discovery may dictate.

Respectfully Submitted,

s/Daniel S. Wolter
Daniel S. Wolter (WOL012)
Ashley E. Manning (MAN048)
Attorneys for Fred's Stores of Tennessee, Inc.

**OF COUNSEL:**
**Gaines, Wolter & Kinney, P.C.**
3500 Blue Lake Drive
Suite 425
Birmingham, AL 35243
Phone: (205) 980-5888
Fax:    (205) 980-1098

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jackson B. Harrison, Esq.
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, Alabama 36117


s/Daniel S. Wolter
OF COUNSEL

8

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

LINDA SPIVEY,                          )
                                       )
    Plaintiff,                         )
                                       )
v.                                     )       **CASE NUMBER:**
                                       )       **2:07-CV-594-WHA**
FRED'S, INC.,                          )
                                       )
    Defendant.                         )

---

## AMENDED ANSWER

---

Comes Now the Defendant, Fred's Stores of Tennessee, Inc., incorrectly identified in Plaintiff's Complaint as "Fred's, Inc." (hereinafter "Fred's") and hereby amends its previously filed Answer to Plaintiff's Complaint as follows:

1.    Fred's adopts and incorporates its previously filed Answer as if fully set forth herein.

2.    Fred's asserts the defense of assumption of the risk.

3.    Fred's denies the Plaintiff's alleged injuries and/or damages were caused by any act or omission by Fred's or any of its agents or employees.

4.    Fred's reserves the right to assert additional defenses, including affirmative defenses, at a later date.

Respectfully Submitted,

s/Daniel S. Wolter
Daniel S. Wolter (WOL012)
Ashley E. Manning (MAN048)
Attorneys for Fred's Stores of Tennessee, Inc.


EXHIBIT
E

**OF COUNSEL:**
**Gaines, Wolter & Kinney, P.C.**
3500 Blue Lake Drive
Suite 425
Birmingham, AL 35243
Phone: (205) 980-5888
Fax:    (205) 980-1098

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 14th day of September, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jackson B. Harrison, Esq.
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, Alabama 36117

s/Daniel S. Wolter
OF COUNSEL